The undersigned have reviewed the prior Opinion and Award based upon the proceedings before Deputy Commissioner Hoag. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with the modification establishing that plaintiff's compensable psychological injury is not related to her ongoing disability and other minor technical modifications.
*******************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Hartford Accident and Indemnity is the carrier on the risk.
4. The date of plaintiff's compensable injury was May 18, 1992.
5. A Form 21 Agreement entered into by both parties was approved by the Industrial Commission on July '15, 1992. The Form 21 set forth plaintiff's average weekly wage as $425.80, yielding a compensation rate of $283.88.
6. A Form 24 Agreement was approved by the Industrial Commission on June 15, 1994.
7. The following medical records were submitted into evidence as stipulated by both parties:
 a. Records of Dr. W. Michael Nesbit as attached to his deposition.
 b. Records of Dr. Kenneth Dols as submitted by letter of counsel for defendant dated June 6, 1996.
 c. Records of Dr. Jeffrey Bruce Feldman in Exhibits 1-6 attached to his deposition.
 d. All Commission forms contained in the Commission file.
8. The issues for resolution are:
 a. Did plaintiff unjustifiably refuse to attempt alternative employment procured for her by defendant-employer on May 19, 1994?
 b. Is plaintiff entitled to temporary total disability compensation beyond May 31, 1994 and continuing?
 c. Is plaintiff entitled to permanent total disability compensation due to mental depression allegedly caused and/or aggravated by the scheduled injury?
*******************
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a forty-five year old female employee of defendant-employer. She worked for the company for twenty years as a mold breaker until she was injured in the course of her employment on May 18, 1992. Plaintiff completed the eleventh grade and began the twelfth grade but did not complete it. After leaving high school, she has obtained no additional education or training.
2. Plaintiff was assigned to perform a number of tasks as a mold breaker including straightening paper, running the compound machine, making boxes and breaking molds during her employment with defendant-employer. All of her work with defendant-employer was production work involving repetitive motion by the hands and wrists.
3. Plaintiff worked on an assembly line, disassembling metal molds containing plastic air condition filters. A mold consists of two metal pieces into which a compound or plastic has been poured and covered. When the molds rolled down the line, plaintiff's job was to take the top part of the mold off, pull the air conditioning filter out of the mold and stack the molds.
4. Plaintiff was expected to remove 1,000 air conditioner filters per hour during her eight hour work day. After she reached the level of 7,200 molds, plaintiff was given a bonus and was compensated at a higher rate of pay based on her production.
5. Plaintiff's work shifts normally began at 6:15 a.m. and ended at 2:15 p.m. She was allowed a ten minute break for breakfast and a twenty minute break for lunch. Plaintiff worked at the job of mold breaker for six to seven years.
6. Plaintiff sustained a compensable injury on May 18, 1992 arising out of and in the course of her employment at defendant-employer's. Plaintiff received temporary total disability benefits during the period from June 2, 1992 through May 31, 1994. Defendant-employer terminated plaintiff's employment in June 1994.
7. According to Dr. Michael Nesbit, plaintiff had a psychoneurotic anxiety disorder and some depression prior to her job injury in 1992. However, the first time plaintiff had ever been on nerve medication was in September of 1993.
8. Dr. Kenneth Dols referred plaintiff to Dr. Williams for a check on a possible diabetes problem in 1992. At that time, plaintiff denied ever having diabetes, or having been treated for diabetes.
9. Plaintiff began experiencing pain and numbness in her hands as early as January 10, 1989 when she was diagnosed by Dr. Dols with ulnar nerve neuritis. However, she continued in her job breaking molds. Subsequently, plaintiff underwent carpal tunnel release to the right wrist and elbow on October 12, 1992 after having complained of pain for two years.
10. Occupational therapy was initiated on October 20, 1992 with Compleat Rehab Services in Gastonia, North Carolina. Plaintiff had extensive conservative pain management to both hands and multiple consultations with Dr. Stephen Naso, Dr. Raymond Sweet and Dr. Paul Perlik.
11. Plaintiff had similar but milder symptoms in the left hand, requiring carpal tunnel injections on November 17, 1992 to relieve discomfort
12. Subsequently, plaintiff received frequent injections in both hands of Celestone (a steroid) and Lidocaine for pain management. Since her hand injuries, plaintiff has been unable to use her right hand in activities of daily living and self care so that she is dependent upon her teenage daughter for assistance. She has not worked and has not earned wages of any kind since June 2, 1992.
13. In December 1992, Dr. Dols rated plaintiff as having a 15% permanent partial impairment rating to the right extremity and released her for return to non-repetitive, non-stressful work.
14. Plaintiff was released to return to light duty work such as desk work, telephone answering or acting as a messenger. On April 28, 1995, plaintiff was still under the same permanent work restrictions as originally imposed in December 1992. Dr. Dols also recommended that plaintiff continue to wear a splint.
15. In May 1993, defendant-carrier recommended that plaintiff undergo pain therapy at the Charlotte Institute for Rehabilitation Center. In June 1993, plaintiff was evaluated and found to be a suitable candidate for the program. At that time, she had no psychological impediments to participating in the program. Plaintiff entered the program in September 1993 where she received therapy for approximately five weeks. Plaintiff's therapy included the following: exercises for her hand, general strengthening, pain management and psychological counseling. She was prescribed medication for physical pain and depression.
16. As part of her enrollment at the Rehabilitation Center, plaintiff underwent a functional capacity examination, performed by James F. Parhamovich, M.S. on October 1, 1993. The examination revealed that plaintiff was extremely limited in the amount of work she was able to perform. Plaintiff technically did not have the capability of performing many of the jobs classified as sedentary work by the United States Department of Labor in the Dictionary of Occupational Titles. Mr. Parhamovich recommended positions listed as sedentary in the Dictionary of Occupational Titles which would be suitable for plaintiff. Those positions were telephone solicitor and telephone operator. Mr. Parhamovich recommended plaintiff return to work part time and gradually work up to a full time job.
17. During the course of her treatment for hand pain and neurologic dysfunction in 1993, Dr. W. Michael Nesbit diagnosed plaintiff with diabetes mellitus (Type II) which could be adequately controlled on diet and the medication Micronase.
18. Plaintiff was prescribed several anti-depressants such as Zoloft, Doxepin and Klonopin beginning by Dr. Nesbit in September 1993 for her nerves.
19. Defendant-employer notified plaintiff on May 19, 1994 of a job opening in their Security Department as a Security Officer. Plaintiff was offered a position as a security guard by defendant-employer. The security guard position entailed rotating among the defendant-employer's three manufacturing plants. Plaintiff's duties and responsibilities were to include guarding the company's property and performing security checks. In two of the buildings, the security checks were accomplished by pushing a button at certain designated spots on the property. In the other building, it involved inserting and turning a key into a clock. The job position was described as having the following duties:
 Working 8 hour days, 40 hours a week, rotating between 3 plants. Security Officer will be working every Saturday and Sunday with 2 days off each week. The Security Officer has a portable cellular phone making calls once every hour, walking throughout the plant inserting a plastic card in a slot every 3 hours. The officer also has a buggy to ride in and drive at larger plants. There are some steps to climb. One guard house position consists of pushing buttons to open gates infrequently.
20. Plaintiff had agreed to performing the light duty, nonstressful activities that Dr. Dols had described to her such as desk work, telephone answering or messenger. However, plaintiff expressed fear and reservations regarding her ability to perform the duties of a security officer position given the physical limitations of her hands.
21. Dr. Dols also had concerns about plaintiff's ability to safely operate a motorized buggy. Plaintiff told Dr. Dols that she was afraid that she would be unable to control the buggy. Mr. Franklin Hunt of defendant-employer stated that buggies were not essential to the security position and were available for comfort and convenience only.
22. Plaintiff was also fearful for her safety as a security guard since she was having difficulty with her right arm. She did not believe that she could defend herself while performing as a security guard. In addition, plaintiff had pain and numbness in her arms when she held them down by her side while walking for any extended period of time.
23. Plaintiff's fear for personal safety was reasonable and justified based upon her knowledge that an able-bodied, male security officer had been killed in the course of his work when an intruder shot him while he was on his security check route at defendant-employer's plant. After the shooting incident, defendant-employer provided its security guards with walkie-talkies so that they could check in with each other. Security guards were not armed.
24. Plaintiff did not accept the security officer position and has remained unemployed to date as a result of being terminated by defendant-employer in June, 1994. Defendant-employer has made no additional efforts to find plaintiff a suitable job.
25. Dr. Michael Nesbit concluded that plaintiff's job-related injury and physical problems associated with her diminished capacity to work, aggravated her pre-existing tendencies toward depression. The aggravation of her depressed condition warranted prescriptions of anti-depressant medications.
26. Plaintiff's depression became more accentuated after surgery on her right upper arm in October, 1994. She experienced feelings of depression with no desire to eat or to socialize and she lacked energy. Plaintiff, at the time of the hearing, did not sleep well and easily feels hurt and weeps. She feels guilty that she cannot do things for her family and has had occasional thoughts of suicide. Although she is anxious to get back to work, plaintiff is frustrated that thus far, the only jobs offered by defendant-employer are ones that she cannot perform.
27. Plaintiff's depression is not a significant contributing factor to plaintiff's ongoing inability to earn wages.
28. Plaintiff has proven by a preponderance of the competent, credible evidence of record that her refusal to attempt the security officer position offered her by defendant-employer on May 19, 1994, given her physical conditions and limitations and psychological disorders, was justifiable.
29. Plaintiff's treatment by Dr. Nesbit for her depression, including prescribed medication, is necessary and reasonable.
*******************
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable occupational injury to her hands, primarily her right hand, resulting in carpal tunnel syndrome on May 18, 1992. Plaintiff and defendants entered into a Form 21 Agreement approved by the Industrial Commission on July 15, 1992. As a result of the occupational injury, plaintiff retains an impairment of 15% to her right upper extremity.
2. Plaintiff's existing tendency to be clinically depressed was aggravated by her occupational injury. As a result of chronic pain and inability to perform usual acts of living which plaintiff performed prior to her injury and plaintiff's depression has significantly worsened. The more systematic depression plaintiff has experienced since her injury and now experiences is a direct and natural result of the compensable occupational injury. Plaintiff is still receiving treatment and will require future treatment for her depression. Plaintiff's compensable depression is not a significant contributing factor with regard to plaintiff's ongoing inability to earn wages. Starr v. PaperCompany, 8 N.C. App. 604, 175 S.E.2d 342 (1970); Hill v. HanesCorp., 79 N.C. App. 67, aff'd in part and rev'd in part, 319 N.C. 167,353 S.E.2d 392 (1970); N.C. Gen. Stat. § 97-25.
3. An aggravation of an injury or a distinct new injury is compensable when the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct. Dalton v. Anvil Knitwear,119 N.C. App. 275, 458 S.E.2d 251, (1995). An employer must take his employee as he finds him, and an employer will be liable for the full extent of the employee's compensable injury even where a pre-existing condition substantially contributes to the degree of the injury. Wilder v. Barbour Boat Works, 84 N.C. App. 188,352 S.E.2d 690 (1987).
4. The offer of the security guard position was not an offer of suitable employment by the defendants because plaintiff could not perform the job safely given her physical condition and limitations resulting from her compensable occupational injury. Plaintiff's refusal was justified in the opinion of the undersigned. Bowden v. Boling Company, 110 N.C. App. 226,429 S.E.2d 394 (1993); N.C. Gen. Stat. § 97-32.
5. Plaintiff was terminated by defendant-employer in June, 1994. Defendant-employer has made no attempt to find plaintiff a suitable job or to provide vocational rehabilitation assistance although plaintiff is capable of working within restrictions and work would be of benefit to her overall health. There is no evidence of record to suggest that any jobs are available for a person of plaintiff's limitations, work restrictions, need for limited hours and continued depression. Defendant-employer has not come forward to present any evidence that plaintiff is capable of obtaining employment at the same or any wages she was making prior to her occupational injury. Kennedy v. Duke Power, 101 N.C. App. 24, 398 S.E.2d 677 (1990).
6. Because the defendants have failed to show by the greater weight of the evidence that there are suitable jobs available to the plaintiff that could be obtained by a diligent effort, plaintiff is entitled to temporary total disability benefits from May 31, 1994 and continuing so long as plaintiff remains temporarily totally disabled, returns to work or until further Order of the Commission. That portion of plaintiff's temporary total disability compensation from May 31, 1994 to the date of the filing of this Opinion and Award has accrued and shall be paid to plaintiff in a lump sum payment, subject to attorney's fees. N.C. Gen. Stat. § 97-29.
7. Plaintiff's average weekly wage is $425.80, yielding a compensation rate of $283.88.
*******************
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
AWARD
1. Defendants shall pay plaintiff temporary total disability compensation from June 1, 1994 until plaintiff is no longer disabled, returns to work or until further Order of the Commission. Plaintiff's temporary total disability benefits have accrued from June 1, 1994 until the date of the filing of this Opinion and Award and shall be paid to plaintiff in a lump sum amount subject to reasonable attorney's fees. Henceforth, defendants are to pay plaintiff at the rate of $283.88 per week, subject to reasonable attorney's fees.
2. Defendants shall pay for all reasonable medical treatment including the mental depression of plaintiff, which tends to effect a cure, give relief or which tends to lessen the period of her disability.
3. Defendants shall pay to plaintiff's attorney 25% of the lump sum amount due plaintiff under paragraph one (1) above. The amount shall be deducted from the lump sum amount and sent directly to plaintiff's attorney. Henceforth, plaintiff's attorney shall be entitled to receive directly from defendants, every fourth check due plaintiff.
Defendants shall pay the costs.
 S/ _______________________ DOUGLAS E. BERGER DEPUTY COMMISSIONER
CONCURRING:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
DEB:sm