Based upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties in the I.C. Form 21, Agreement for Compensation approved by the Commission on October 28, 1994, in their Pre-Trial Agreement filed on January 27, 1997 and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case; the parties are properly before the Commission; and, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Employers Insurance of Wausau was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff sustained an admittedly compensable injury on August 8, 1994, as a result of which the parties entered into the Form 21 Agreement. The plaintiff has received benefits pursuant to the Form 21 from August 9, 1994 through October 28, 1996.
5. The plaintiff's average weekly wage was $440.00, which yields a compensation rate of $293.35 per week.
6. On or about September 20, 1996, the plaintiff returned to work as President of a construction company, earning wages in excess of his average weekly wage.
7. A Form 28T, Trial Return to Work, was filed with the Industrial Commission on October 31, 1996.
8. The issues for determination are:
 a. Has the plaintiff reached maximum medical improvement as a result of the injuries sustained in the admittedly compensable accident of August 8, 1994?
 b. Is the plaintiff entitled to permanent partial impairment compensation under N.C. Gen. Stat. § 97-31(23) as a result of the admittedly compensable injury of August 8, 1994?
 c. Is the plaintiff entitled to permanent partial impairment compensation pursuant to N.C. Gen. Stat. § 97-31(24) ?
 d. Has the plaintiff cooperated with vocational rehabilitation services provided by the defendants?
 e. Are the defendants entitled to a credit for temporary total disability benefits paid after the plaintiff reached maximum medical improvement?
 f. Is either side entitled to have an assessment of attorney's fees against the opposing party?
 *********** RULING ON EVIDENTIARY MATTER
The deputy commissioner's ruling denying plaintiff's motion to reopen the record to receive and consider a Form 28U is hereby REVERSED. This Form 28U is received into evidence and shall be considered herein.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission modifies the findings of fact of the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the admittedly compensable injury, the plaintiff was a forty-two year old male, who was employed as a roofer. The plaintiff had undergone a lumbar fusion at L4-5 and L5-S1 in 1982, unrelated to the injury giving rise to this claim.
2. On September 29, 1993, the plaintiff sought medical treatment from Dr. J. A. Sanders for numbness in both testicles and an inability to have an erection. However, at the hearing, the plaintiff denied having sought this treatment.
3. On August 8, 1994, the plaintiff sustained an admittedly compensable injury when he slipped and twisted his back. The plaintiff began treatment with Dr. Alfred L. Rhyne III, of Charlotte Orthopaedic Specialists, on September 2, 1994, at which time he complained of intractable back and left leg pain. Dr. Rhyne ordered a course of conservative treatment.
4. As a result of plaintiff's back injury, on January 31, 1995, Dr. Rhyne performed an anterior fusion at L4-5, L5-S1, with a left iliac crest bone graft.
5. On March 6, 1995, the plaintiff complained to Dr. Rhyne of an inability to achieve an erection. The plaintiff told Dr. Rhyne that he had experienced this problem since before the surgery, but he did not tell the doctor that he had sought treatment from Dr. Sanders for it. On April 7, 1995, the plaintiff complained to Dr. Rhyne of bladder control problems.
6. A CT scan showed nerve roots in the fusion area were unaltered and in a normal position.
7. On April 12, 1995, the plaintiff was seen by Dr. Anthony Wheeler of Charlotte Orthopaedic Associates, at which time he complained of numbness in the testicles and penis, frequency and urgency of urination, swelling of his legs, and an inability to achieve an erection. The plaintiff omitted telling this doctor that he had seen Dr. Sanders for treatment of this problem in 1993.
8. Dr. Wheeler referred plaintiff to Dr. Gerson Asrael of the Nalle Clinic for an urological evaluation. The plaintiff was first seen on April 21, 1995. At the initial visit, the plaintiff reported to Dr. Asrael that he had experienced bladder and erectile dysfunction since the surgery. However, the plaintiff advised Dr. Asrael that he had experienced no such problems prior to his surgery.
9. On April 28, 1995, the plaintiff underwent diagnostic studies performed by Dr. Frederick E. Pfeiffer, Mecklenburg Neurological Associates, which revealed a normal bladder sensation and capacity.
10. On June 5, 1995, Dr. Rhyne noted that x-rays revealed a solid fusion and that plaintiff's urinary problems were almost normal, although the plaintiff complained of continuing erectile dysfunction. An EMG revealed bilateral radiculopathy as the probable cause of plaintiff's leg pain.
11. On July 17, 1995, Dr. Rhyne found that the predominance of plaintiff's symptoms had resolved and that plaintiff continued to experience erectile dysfunction. He ordered work conditioning in one month. On August 14, 1995, Dr. Rhyne advised that while the plaintiff could not return to the roofing job, he was capable of performing sedentary work. Thereafter, Dr. Wheeler opined that the plaintiff's impotence may be due to his medication.
12. On October 26, 1995, the plaintiff returned to Dr. Asrael, at which time a cystoscopy was performed. At that time, the plaintiff had been off of his pain medication for a few months. Dr. Asrael concluded that the plaintiff's lower urinary irritative symptoms were not caused by the back injury. He informed the plaintiff that he did not have a neurogenic bladder dysfunction, and found that plaintiff required no further treatment for urinary symptoms. Dr. Asrael advised that it would be appropriate for the plaintiff to use a non-surgical penile vacuum for his impotence.
13. Dr. Asrael opined that plaintiff's temporary urinary dysfunction was likely due to the pain medications prescribed for plaintiff's injury and that neither the erectile nor bladder dysfunction was due to nerve damage.
14. Neither Dr. Rhyne, nor Dr. Asrael related the plaintiff's erectile dysfunction to his surgery after they were informed that the plaintiff had required treatment for the condition in 1993, prior to the injury at work. Moreover, on November 6, 1995 the plaintiff declined any further testing to determine the cause of his impotence.
15. On November 6, 1995, both Drs. Rhyne and Wheeler released the plaintiff to return to a sedentary-to-light physical demand category of work. On November 6, 1995 Dr. Wheeler recommended a functional capacity evaluation and vocational counseling for the plaintiff.
16. After completing functional baseline testing at HealthSouth Rehabilitation Center, the plaintiff was found capable of performing up to four hours of sedentary work. Dr. Wheeler saw the plaintiff on December 7, 1995, at which time he recommended that plaintiff return to work within these guidelines, and gradually work up to an eight hour workday. Dr. Wheeler further advised the plaintiff that no further medical treatment was recommended.
17. The plaintiff requested a second opinion, and was seen at Oweida Orthopaedic Clinic by Dr. Russell T. Garland February 26, 1996. After reviewing plaintiff's records and conducting a physical examination, Dr. Garland concurred with the opinions of Drs. Wheeler and Rhyne.
18. At the time that plaintiff was determined to have reached maximum medical improvement and was rated by Dr. Rhyne with a twenty-five percent (25%) permanent partial impairment to his back on November 6, 1995, plaintiff had not yet reached the end of his healing period. On November 6, 1995 plaintiff was incapable of returning to prior job duties as a roofer and he was incapable of working eight hours per day in a sedentary job. Defendant has not shown that plaintiff had wage-earning capacity as of November 6, 1995; consequently, plaintiff's presumption of disability under the I.C. Form 21 continued.
19. Defendants did not offer plaintiff a job after his release to return to work because they did not have a job available that would accommodate his restrictions.
20. The defendants retained John McGregor, a vocational counselor, to assist plaintiff in obtaining work suitable to his capacity. Mr. McGregor recommended that the plaintiff obtain his GED, but the plaintiff refused to do so. A job search was initiated on February 1, 1996. Although the plaintiff made telephone calls to a number of employers, he did not submit applications for those jobs for which applications were required. On June 13, 1996, plaintiff's counsel advised Mr. McGregor that his client had cooperated with rehabilitation efforts as fully as necessary; that plaintiff was terminating the rehabilitation services; and that they wished to await a decision from the Industrial Commission.
21. Plaintiff's counsel referred him for a second functional capacity evaluation on August 7, 1996 at Rehability, at which time the results indicated that the plaintiff gave sub-maximal effort and engaged in symptom magnification. Nevertheless, the FCE found that plaintiff was capable of performing sedentary-level work.
22. In response to defendants' Industrial Commission Form 24 application to stop payment of benefits to plaintiff filed July 5, 1996 on the basis of plaintiff's alleged noncompliance with N.C. Gen. Stat. § 97-25, Special Deputy Commissioner Amy L. Pfieffer issued an Order on August 18, 1996 directing the plaintiff to fully comply with reasonable vocational efforts. Said order further found that plaintiff's actions did not rise to the level of noncompliance that justified suspension of benefits. Following the issuance of this Order, Mr. McGregor attempted unsuccessfully to contact the plaintiff by telephone. Plaintiff's counsel later advised Mr. McGregor that the plaintiff had returned to work on September 20, 1996. However, neither the plaintiff, nor his counsel timely notified the defendants of plaintiff's return to work and as a result, the plaintiff received five weeks of additional temporary total disability benefits to which he was not entitled during the period from September 20, 1996 through October 28, 1996. Defendants are entitled to a credit for any temporary total disability compensation paid to plaintiff after September 20, 1996.
23. On September 20, 1996, the plaintiff returned to work with L.A. Contractors, Inc., as a construction project manager for which he was paid at the rate of $1,000.00 per week. The company originally planned to do drywall work in the Wilmington, North Carolina area following Hurricane Fran. However, after arriving in Wilmington, due to the high demand for roofers and plaintiff's expertise in the roofing business, Christopher Risher, the owner of the company, retained the plaintiff to supervise and manage his roofing business. A separate company was incorporated to handle the roofing and remodeling business under the name, Country Concepts. Since October 16, 1996, the plaintiff has been its director and president. The plaintiff was paid $1,000.00 per week for his work with Country Concepts.
24. On December 30, 1996, John McGregor reviewed plaintiff's job at Country Concepts. During this meeting, Mr. McGregor noted that the plaintiff appeared very positive about his employment status, was in better condition, and in better health. The plaintiff described the work as involving forty percent office work, and the remainder of the work involving presentation of bids, purchasing for projects, employee placement, supervision of completion schedules for projects, and ensuring that the projects are within budget.
25. Following the meeting, Mr. McGregor found the plaintiff's work to be within those functions of a construction project manager, which is classified as sedentary level work. The job was appropriate to the job restrictions as imposed by plaintiff's treating physicians. Furthermore, the job of construction project manager is one which is available in the regular job market. Plaintiff stopped working for Country Concepts on February 18, 1997 due to a decline in the company's business. There is no evidence that plaintiff's failure to earn wages after February 18, 1997 was due to his compensable injury.
26. The defendants submitted a Form 28T, upon learning that the plaintiff had returned to work with Country Concepts or L. A. Contractors and stopped paying benefits on October 28, 1996.
27. At no time between the date plaintiff returned to work as a construction project manager with L.A. Contractors and/or Country Concepts and the date the record in this case was closed on April 7, 1997, did any physician find plaintiff unable to perform the job of construction project manager. Plaintiff sought to reopen the record to include an Industrial Commission Form 28U filed August 8, 1997 indicating an unsuccessful trial return to work. The deputy commissioner denied plaintiff's motion; however, the Full Commission has reversed this decision and reopened the record to allow the Form 28U to be admitted as evidence. Upon review of the Form 28U, plaintiff's statutory time period for a trial return to work ended before his treating physician certified he was unable to work due to the injury. Also, the reason plaintiff cited for stopping work on February 18, 1997 was due to decline in the business, rather than an incapacity to work.
28. At the time of the hearing, Mr. Risher was engaged to the plaintiff's daughter, and to the extent that he attempted to offer testimony to contradict the above findings, his testimony is not accepted as credible.
29. Neither side is entitled to have an assessment of attorney's fees against the opposing party as a penalty.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The plaintiff sustained an admittedly compensable injury by accident to his back arising out of and in the course of the employment on August 8, 1994. N.C. Gen. Stat. § 97-2(6).
2. Defendants' agreement to pay compensation for "necessary" weeks under the I.C. Form 21 approved by the Commission on October 28, 1994 created a presumption of ongoing disability. Kisiah v. W. R. Kisiah Plumbing, Inc., 124 N.C. App. 72
(1996).
3. Defendants have failed to show that suitable employment was available or offered to plaintiff at the time he was released to light duty work on November 6, 1995. Defendants have otherwise failed to establish that plaintiff had wage earning capacity as of November 6, 1995 and thus the presumption of disability continued. N.C. Gen. Stat. § 97-29; Watkins Central v. Motor Lines, Inc.,279 N.C. 132, 181 S.E.2d 588 (1971); Dalton v. Anvil Knitwear,119 N.C. App. 275, 458 S.E.2d 251, disc. review denied and cert.denied, 341 N.C. 647, 462 S.E.2d 507 (1995); and Kisiah v. W. R.Kisiah Plumbing, Inc., 124 N.C. App. 72 (1996).
4. Defendants have rebutted plaintiff's presumption of continuing disability after September 20, 1996 by showing that plaintiff returned to work on September 20, 1996, earning higher wages in a job available in the competitive market place and which was suitable to his restrictions; that plaintiff was able to perform this job; and that plaintiff's failure to work after February 18, 1997 was due to a business decline, rather than incapacity to work. Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 472 S.E.2d 382, cert. denied, 344 N.C. 629,477 S.E.2d 39 (1996).
5. The Special Deputy Commissioner correctly disapproved the Form 24 application. Defendants did not appeal from the finding of the Special Deputy Commissioner that plaintiff's conduct did not rise to the level of noncompliance that justified a suspension of plaintiff's benefits. Maynor v. Sayles,116 N.C. App. 485, 448 S.E.2d 382 (1994). Sanhueza v. Liberty SteelErectors, 122 N.C. App. 603, 471 S.E.2d 92 (1996).
6. The plaintiff is entitled to have defendants pay temporary total disability compensation at the rate of $293.35 per week from August 9, 1994 until September 20, 1996 when he returned to work earning the same or greater wages. Defendants have already paid plaintiff temporary total disability from August 9, 1994 through October 28, 1996. The defendants are entitled to a credit for overpayment of temporary total disability benefits to the plaintiff for the period from September 20, 1996 through October 28, 1996. N.C. Gen. Stat. §§ 97-29 and 42.
7. The plaintiff is entitled to have defendants pay permanent partial disability compensation at the rate of $293.00 per week for seventy-five weeks as a result of the twenty-five percent impairment rating to his back. N.C. Gen. Stat. § 97-31(23).
8. The plaintiff is not entitled to permanent disability compensation for permanent damage to the bladder as the dysfunction he sustained was temporary in nature, and resolved upon his cessation of taking pain medication. The plaintiff is not entitled to permanent disability compensation as a result of any erectile dysfunction, as said condition has not been established by the greater weight of the evidence as having been causally related to the compensable injury. N.C. Gen. Stat. § 97-31(24).
9. The plaintiff is entitled to have the defendants pay for medical expenses incurred or to be incurred in the future as a result of his compensable injury for so long as the same may be reasonable required to provide relief, effect a cure or lessen the period of disability, including treatment for the temporary bladder dysfunction. However, the defendants shall not be liable for the treatment for the erectile dysfunction, as there is no competent medical evidence in the record to causally relate this condition to the plaintiff's compensable injury. N.C. Gen. Stat. § 97-2(19).
10. Plaintiff's treating physician's July 27, 1997 certification that he was unable to work due to his injury was obtained after his statutory period for a trial return to work ended and is given no weight in this case. Also, there is no evidence that plaintiff's failure to work after February 18, 1997 was due to his injury.
11. Neither side is entitled to have an assessment of attorney's fees against the opposing party as a penalty. I.C. Rule 802.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provided for below, for plaintiff's compensable injury, defendants shall pay the plaintiff temporary total disability compensation at the rate of $293.35 per week from August 9, 1994 through September 20, 1996 when he returned to work earning the same or greater wages. Since defendants have already paid plaintiff temporary total disability through October 28, 1996, no further temporary total disability is due the plaintiff and defendants are entitled to a credit for any overpayment after September 20, 1996.
2. Subject to a reasonable attorney's fee herein approved, the defendants shall pay permanent partial disability compensation at the rate of $293.00 per week for seventy-five weeks, subject to defendants' credit for overpayment of temporary total disability benefits. Defendants are entitled to credit for all temporary total disability compensation paid plaintiff between September 20, 1996 and October 28, 1996. As much of said compensation as has accrued shall be paid in a lump sum.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff herein is approved for plaintiff's counsel and shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act, including bills for treatment of the temporary bladder dysfunction, but not including bills for treatment of the erectile dysfunction.
5. Defendants shall pay the costs.
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ J. HOWARD BUNN, Jr. CHAIRMAN
S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER