* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Taylor with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and this is the Court of proper jurisdiction for this action. *Page 2 
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On the alleged date of injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. Gallagher Bassett Services, Inc. was the compensation carrier on the risk.
6. All of plaintiff's medical records will be submitted as a Stipulated Exhibit.
7. All Industrial Commission forms and filings will be submitted as a Stipulated Exhibit.
8. Plaintiff's average weekly wage is to be determined.
9. Plaintiff's alleged date of injury is May 10, 2002.
10. At the hearing of this matter, a large package of medical records was received as Stipulated Exhibit 1 and a package of Industrial Commission forms filed in this case was received as Stipulated Exhibit 2.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. This is an admittedly compensable claim in which plaintiff is receiving ongoing disability benefits pursuant to Forms 60 and 21.
2. Plaintiff was 58 years of age as of the date of hearing before the Full Commission, having a date of birth of August 29, 1948. He has a high school diploma and one year of courses at Durham Business College. Plaintiff's work history includes service in the U.S. Marine Corp, *Page 3 
construction work, and work as a taxi and delivery truck driver prior to work with defendant.
3. Plaintiff began work with defendant in February 1995. He received pay raises and satisfactory evaluations, performing job duties as a packer, a material handler, and a process machine operator.
4. On May 10, 2002, while in the course and scope of his employment with defendant, plaintiff sustained an admittedly compensable injury when his head struck a piece of metal machinery and he fell to the floor from which he was unconscious for an undetermined period of time. Plaintiff's head was cut, blood was streaming down his face, and he felt a dent in his head. He was transported by Emergency Medical Services to Western Wake Medical Center. His next recollection was hearing his wife's voice in the emergency room. Plaintiff's injuries required emergency room treatment, and plaintiff has required medical and psychiatric care and treatment since that time.
5. Despite requests by plaintiff, no Form 22 wage transcript was prepared or filed by defendants. At the hearing of this matter, plaintiff's Exhibits 1-3 were received in evidence. These consisted of a W-2 form showing total earnings of $25,063.13 in 2001 and two W-2 forms showing total earnings in 2002 of $15,976.76 through the date of injury, May 10, 2002. In the post-hearing Order, filed August 30, 2005, defendants were allowed 60 days within which to file a Form 22 wage chart. On December 28, 2005, a Form 22 was submitted by defendants indicating total earnings of $27,766.71 during the 52 weeks prior to injury equating to an average weekly wage of $533.97 and a compensation rate of $356.00. However, this form appears inconsistent with the W-2 wage records received in evidence and may not include overtime or bonus compensation. The Form 21 indicated an average weekly wage of $505.13 and a compensation rate of $336.77. *Page 4 
6. A review of the foregoing records indicates plaintiff's indemnity benefits have been underpaid. The following calculation most nearly approximates the wages plaintiff earned in the 52 weeks prior to his injury on May 10, 2002. Plaintiff's wages from 2001 were $25,063.13 divided by 365 days equals a daily rate of $68.67. Multiplying this by the 235 days worked from May 11, 2001 through the end of the year yields earnings of $16,137.45. Adding this to the known 2002 earnings through the date of injury of $15,976.76 totals $32,114.21 earned in the 52 weeks prior to injury. Divided by 52, this indicates an average weekly wage of $617.58 and a compensation rate of $411.74, which is fair and just to both parties. Defendants presented no evidence explaining the discrepancy between the Form 22 and the W-2 forms previously received in evidence.
7. It is undisputed from the lay testimony of record that plaintiff worked a considerable amount of overtime in the 52 weeks prior to his injury.
8. Following plaintiff's injury, he suffered the onset of involuntary seizures, dizziness, headaches, and secondary depression. Plaintiff suffers seizures, sometimes as often as two per day. The frequency and severity of these seizures varies. Traveling in a car or any stressful situation can trigger the seizures. Plaintiff has many days when he does not get out of his house. He is not able to maintain regular attendance in any type of employment. Plaintiff has no driver's license. He has significant problems with memory and concentration. Plaintiff needs attendant care so that someone familiar with his situation is present to avoid injury to him. During plaintiff's testimony, plaintiff had a seizure. Plaintiff lost control, became disoriented, began shaking violently and was unresponsive. During the seizure plaintiff had to be held by his wife, Darlene Green. *Page 5 
9. Following emergency room treatment at Western Wake Medical Center Emergency Room, plaintiff was seen by a company doctor at Concentra for drug testing pursuant company policy. The results were negative. Thereafter, he was seen and treated by his family physician, Dr. Paine. Plaintiff was seen by Dr. Potter, a company doctor at Concentra Medical Centers, and he was referred by her to Dr. S. Mitchell Freedman, a neurologist. Plaintiff was then sent to Dr. Jeffrey Siegel, a neurologist, by the insurance carrier. Thereafter plaintiff was evaluated and treated by Dr. James E. Bellard, a psychiatrist, and was evaluated by Dr. Kevin VanLandingham, a neurologist at Duke University Medical Center, on referral from Dr. Freedman. Plaintiff has been seen by a number of other health care providers for a variety of diagnostic studies, evaluations, and treatment modalities.
10. As of the date of hearing, plaintiff was treating with Dr. James E. Bellard, a psychiatrist, and Dr. S. Mitchell Freedman, a neurologist. Treatment by these health care providers has been reasonable and necessary to effect a cure or give relief from plaintiff's symptoms.
11. Dr. Freedman first saw Mr. Green on June 2, 2002 on referral from Dr. Joan Potter, the physician assigned to see plaintiff by the insurance company. Plaintiff related that while working for Keebler he had been knocked unconscious when his head collided with a control panel at his workstation, he was taken to the emergency room and was diagnosed with a concussion, he returned to Dr. Potter several days after the injury complaining of dizziness and vertigo, and was referred by Dr. Potter to Dr. Freedman. Dr. Freedman noticed that Mr. Green exhibited nystagmus indicating there was an organic cause for the plaintiff's dizziness.
12. Dr. Freedman next saw the plaintiff on July 25, 2002. Dr. Freedman learned that in the interim, the insurance carrier had sent the plaintiff to Dr. Siegel who had decided that *Page 6 
plaintiff's symptoms were entirely psychiatric. Thus, the insurance company terminated the plaintiff's work benefits. The insurance company claimed that the plaintiff had a preexisting dizziness condition.
13. Dr. Freedman tried to obtain the plaintiff's medical records from the insurance carrier to determine if the plaintiff had a preexisting medical condition, but it took several attempts before he could get any records. Dr. Freedman became very frustrated with the conduct of the insurance carrier in spite of the fact that he sees claimants at their request and serves as an expert for them on a frequent basis. Dr. Freedman stated, "I saw this man in good faith and felt that the carrier withheld the information I needed." After examining the medical records, Dr. Freedman learned that the insurance carrier denied the case because plaintiff had reported issues with migraines and dizziness in 1999. Dr. Freedman opined that these previous issues had very little to do with plaintiff's symptoms as a result of his work-related concussion, and the insurance carrier's attribution of causation made no sense neurologically.
14. During direct examination, defense counsel asked Dr. Freedman at length about plaintiff's dizziness prior to his May 10, 2002 concussion. Dr. Freedman explained that all of these prior episodes of dizziness prior to his May 10, 2002 concussion are "irrelevant" due to the fact that plaintiff had an eighteen month period before his work-related concussion during which he exhibited no neurological symptoms. Dr. Freedman opined that plaintiff suffered a concussion, and substantially the dizziness that he reported was from that concussion.
15. Plaintiff presented to Dr. Jeffrey Siegel, a neurologist, on two occasions, May 31, 2002 and June 21, 2002 at the behest of the defendant insurance carrier. Dr. Siegel met with plaintiff in the presence of the case manager.
16. Dr. Siegel thought that plaintiff showed signs of embellishing his symptoms of *Page 7 
dizziness. During plaintiff's second visit, Dr. Siegel asked plaintiff if he had gotten better and the plaintiff responded in the negative. Dr. Siegel tried to get plaintiff to agree to go back to work anyway. Plaintiff and Dr. Siegel then had an angry confrontation, and plaintiff attempted to leave Dr. Siegel's office. While leaving Dr. Siegel's office, plaintiff suffered a psychogenic seizure and had to be taken away in an ambulance.
17. Dr. Siegel stated that during the seizure, plaintiff appeared unresponsive and that plaintiff's seizure appeared to be involuntary and probably has a psychiatric cause. Dr. Siegel indicated that the conversion reactions of psychogenic seizures are generally thought in the medical community to be involuntary. Dr. Siegel was of the opinion that plaintiff's seizures are disabling when they occur.
18. Dr. Siegel was of the opinion that he cannot answer whether plaintiff's psychiatric problems were in fact caused by the work place injury, that he would leave that up to the psychiatrist to establish and that plaintiff was having psychiatric problems.
19. He was of the opinion that plaintiff's seizures are psychiatrically based pseudo-seizures, which are disabling when they occur and are real to the patient. Plaintiff will require psychiatric treatment, and Dr. Bellard is an appropriate physician to manage the patient psychiatrically.
20. Plaintiff first presented to Dr. James E. Bellard in February 2004 on referral from Dr. Freedman. Dr. Bellard concluded that plaintiff was significantly depressed and showed no signs of emphasizing or over endorsing symptoms. Dr. Bellard diagnosed plaintiff with major depression, and recommended a course of therapy that included both psychotherapy and medication.
21. Dr. Kevin VanLandingham is an expert in the field of neurology. Plaintiff was *Page 8 
referred to Dr. VanLandingham by Dr. S. Mitchell Freedman for further evaluation of his seizures, and plaintiff presented to Dr. VanLandingham on July 1, 2005, for evaluation. Dr. VanLandingham suspected plaintiff suffered non-epileptic seizures, psychogenic seizures, or pseudo seizures. These seizures are events that appear clinically to be a seizure but occur on the basis of psychological difficulties rather than epileptic or neurological difficulties. Dr. VanLandingham recorded plaintiff's seizures by performing a prolonged, in-lab video EEG on July 14, 2005. No neuropsychological testing was performed. While undergoing the EEG, plaintiff had six episodes and each event showed no movement artifact associated with the events.
22. Dr. VanLandingham's diagnosed plaintiff with non-epileptic or psychogenic seizures, informed plaintiff that the Keppra he was taking, a medication used for seizures, was not beneficial for non-epileptic seizures and recommended more intensive psychological therapy.
23. Dr. VanLandingham was of the opinion that future psychological therapy would benefit plaintiff and would be reasonable and necessary to effect a cure and give relief from his symptoms.
24. Dr. VanLandingham was of the opinion that psychogenic seizures are caused by an individual's desire to get help, that stress could increase symptoms in an individual, that psychogenic seizures could also be the direct result of a brain injury, that plaintiff's history was consistent with an injury he suffered at work in May of 2002 and the onset of symptoms thereafter, and that a physical injury could only bring on psychogenic seizures if the physical injury was a significant traumatic event, such as a near death experience. Dr. VanLandingham indicated it was possible plaintiff's psychogenic seizures are a result of his work injury in May of 2002. *Page 9 
25. Dr. VanLandingham's diagnosis of plaintiff is that he suffers from psychogenic seizures. He went on to state that most adults will not ever stop having such seizures. The success rate in adults of the seizures stopping is low. Dr. VanLandingham could not offer an opinion as to whether or not plaintiff's seizures would ever end, though due to length of time, frequency, severity, and nature of plaintiff's symptoms, it was unlikely that plaintiff will be cured.
26. With regard to whether or not plaintiff's psychogenic seizures could possibly be self-induced, Dr. VanLandingham deferred to plaintiff's psychiatrist. Dr. VanLandingham made no accusation of any malingering on the part of plaintiff and was of the opinion plaintiff's seizures are real to him and are disabling. When plaintiff's seizures occur, he would be required to stop any activity for a period of time and it would not be safe for him to be around moving machinery. The effects of seizures can continue even after the seizure itself has ended.
27. If the seizures could not be controlled, plaintiff would not be able to drive, lead a normal life, or maintain employment. In Dr. VanLandingham's opinion, the longer episodes occur, the less likely they can be controlled. He stated that given the duration of plaintiff's seizures, the likelihood that plaintiff's seizures could be controlled is less than 50%. Plaintiff could only return to work if his seizures could be brought under control.
28. Dr. VanLandingham defers to Dr. James E. Bellard for opinions regarding plaintiff's psychological condition in that he believed plaintiff's psychiatrist should be the one to make decisions as to whether or not plaintiff is permanently and totally disabled from competitive employment. He agreed that Dr. Bellard is an appropriate person to coordinate the care and treatment of plaintiff. Dr. VanLandingham felt much of the testing that needed to be performed for plaintiff has been performed and evaluated, and that plaintiff should follow up *Page 10 
with Dr. Freedman if further referral was needed.
29. Dr. James E. Bellard, plaintiff's treating psychiatrist, has treated plaintiff since February 2004. He is of the opinion that plaintiff will need to continue to be treated psychiatrically. He agreed with the diagnosis of pseudo-seizures, explaining that plaintiff had a conversion reaction in which his symptoms from the accident have manifested as pseudo-seizures. These are involuntary, unpredictable, varying in frequency and severity, and disabling when they occur. These can be triggered by stress and are not controlled by medication at this point. These symptoms are real to plaintiff. These seizures were more likely than not caused by plaintiff's compensable head injury in the opinion of Dr. Bellard. Plaintiff is at risk of further injury as a result of his seizures and would significantly benefit from attendant care. Even with the best psychiatric care and psychotherapy, in the opinion of Dr. Bellard, plaintiff is more likely than not permanently and totally disabled from competitive employment. He is at maximum medical improvement, and it is unlikely that he can be cured. He also suffers from depression secondary to his work-related injury.
30. Although plaintiff had suffered from depression in 1999, Dr. Bellard is of the opinion that the depression plaintiff currently suffers from is of a different magnitude and is entirely new. In fact, plaintiff recovered from his 1999 depression. Dr. Bellard opined that plaintiff's cognitive problems are most likely a function of his depression which was in turn caused by his neurological injury rather than a direct function of neurological injury. Plaintiff's seizures are not likely a side effect of any medication that plaintiff is taking.
31. Dr. Bellard was of the opinion that plaintiff's work injury either caused or was a substantial contributing factor in the development of plaintiff's pseudo-seizures.
32. Plaintiff's healthcare providers prescribed various medications for plaintiff's *Page 11 
work-related injuries including Zyprexa, which caused him to become diabetic.
33. Dr. Freedman was of the opinion that plaintiff is totally disabled from work. Plaintiff is likely to have difficulty with absences of more than four days per month if he returns to employment. Plaintiff's pseudo-seizures would result in the need for frequent unscheduled breaks in any kind of activity.
34. No medical doctor expressed the opinion that plaintiff is able to engage in competitive employment on a regular and sustained basis in his present condition.
35. Plaintiff's admittedly compensable injury by accident caused, or was a substantial contributing factor in the development of, his conversion reaction, depression, pseudo-seizures, headaches, dizziness, and diabetes.
36. Plaintiff has reached maximum medical improvement.
37. Plaintiff is permanently and totally disabled.
38. The medical and psychiatric treatment provided thus far has been reasonable and necessary to give relief from plaintiff's work injury related symptoms. There is a substantial likelihood that lifetime medical and psychiatric care and treatment will be required as a result of plaintiff's work injury related symptoms.
39. The attendant care provided by Darlene Green, plaintiff's wife, has been reasonable and necessary as a result of plaintiff's work-related injuries and symptoms. She is entitled to compensation at the usual rate allowed for non-skilled attendant care for services rendered in the past and for such attendant care services as may be necessary in the future once an evaluation of plaintiff's needs is completed by a neutral and independent Industrial Commission rehabilitation nurse.
40. Plaintiff is in need of a home assessment by a neutral and independent Industrial *Page 12 
Commission rehabilitation nurse to determine what modifications, if any, are necessary to his home as a result of his seizures, dizziness, and impairment, what skill level of attendant care has been required in the past and will be necessary in the future, and any other relevant rehabilitation requirements resulting from plaintiff's compensable injuries.
41. Defendants have interfered with plaintiff's medical care with Dr. Freedman, delayed filing a Form 22 wage transcript despite reasonable, repeated requests, and have denied and defended this claim without reasonable grounds and have repeatedly failed to make timely payment to plaintiff's medical providers.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As a result of plaintiff's compensable injury by accident, plaintiff has been unable to earn his prior wages in the same or any other employment, and has been totally disabled from all employment since May 11, 2002. N.C. Gen. Stat. § 97-29 (2001); Russell v. LowesProd. Dist., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). See also Saums v. Raleigh Community Hospital, 346 N.C. 760, 487 S.E.2d 746
(1997); Kisiah v. W.R. Kisiah Plumbing, 124 N.C. App. 72, 81,476 S.E.2d 434, 439 (1996), disc. review denied, 345 N.C. 343,483 S.E.2d 169 (1997).
2. As a result of plaintiff's injury by accident sustained on May 10, 2002, plaintiff is permanently and totally disabled. N.C. Gen. Stat. § 97-29; Neal v. Carolina Management, 510 S.E.2d 375 (19990 (per curiam); Saums v. Raleigh Community Hospital, 346 N.C. 760,487 S.E.2d 746 (1997). Plaintiff is entitled to compensation at the rate of $411.74 per week from *Page 13 
May 11, 2002 continuing through plaintiff's lifetime, subject to any change of condition. N.C. Gen. Stat. §§ 97-29, 97-47. Dalton v. AnvilKnitwear, 119 N.C. App. 275, 458 S.E.2d 251 (1995); Franklin v. BroyhillFurn. Ind., 123 N.C. App. 200, 472 S.E.2d 382 (1946).
3. Defendants are obligated to provide to plaintiff such medical care and treatment as is reasonably required as a result of plaintiff's injury by accident to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25; Little v. Penn Ventilator Co.,317 N.C. 206, 345 S.E.2d 204 (1986). This includes medical and psychiatric care and treatment for plaintiff's seizures, dizziness, headaches, and diabetes. Drs. Freedman, Bellard, and Paine are designated as the authorized treating physicians for the direction and management of plaintiff's medical treatment.
4. Plaintiff is entitled to attendant care and home modifications as necessary to give relief from his condition and avoid further injury. Attendant care by plaintiff's spouse, Darlene, has been necessary in the past and should be compensated by defendants after completion of an in-home assessment by a neutral and independent Industrial Commission rehabilitation nurse to determine the attendant care previously provided, hours necessary, skill level necessary, and any necessary home modifications and other services which may be required.
5. Defendants delayed providing a Form 22 despite requests, intentionally interfered with plaintiff's medical care by Dr. Freedman, and have unreasonably denied and defended this claim. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD *Page 14 
1. Defendants shall pay to plaintiff permanent and total disability benefits in the amount of $411.74 per week beginning May 11, 2002 and continuing until further order of the Commission. All accrued underpaid indemnity benefits shall be forwarded directly to plaintiff in one lump sum, including the mandatory 10% late payment penalty. N.C. Gen. Stat. § 97-18. Allmon v. Alcatel, 124 N.C. App. 341, 477 S.E.2d 90 (1996).
2. Plaintiff's counsel is entitled to an attorney fee of 25% of the compensation due plaintiff and future compensation.
3. Defendants shall provide all reasonable and necessary medical and psychiatric care and treatment that was or is related to plaintiff's compensable injury by accident for so long as such treatment tends to effect a cure, give relief, or lessen the period of plaintiff's disability.
3. Pursuant to N.C. Gen. Stat. § 97-88.1, defendants shall pay $3,000 of plaintiff's attorney fees based upon defendants' intentional interference with plaintiff's medical care, delay in producing a Form 22 wage transcript, and unreasonable denial and defense of this claim.
4. Defendants shall pay the costs.
This the 2nd day of October, 2006.
S/ ______________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/ ______________ PAMELA T. YOUNG COMMISSIONER
 S/ _________________ BERNADINE S. BALLANCE COMMISSIONER