* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as:
 STIPULATIONS
1. An employment relationship existed between plaintiff and the employer on or about March 9, 2001. *Page 2 
2. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
3. The employer is a duly qualified self-insured with AIG Insurance Company as its servicing agent.
4. On March 9, 2001, plaintiff's average weekly wage was sufficient to yield the maximum compensation rate for 2001 of $620.00.
5. Plaintiff suffered a compensable injury by accident on March 9, 2001.
6. Defendant has paid benefits pursuant to N.C. Gen. Stat. § 97-29
during all periods of disability since March 9, 2001.
 * * * * * * * * * * * ISSUES
The following are the issues in contention.
1. Is the plaintiff entitled to ongoing medical treatment through Dr. Sonia Pasi for his chronic headaches?
2. Are the plaintiff's neck condition, hearing loss and psychological problems related to his compensable injury?
3. Has the plaintiff made reasonable efforts to secure employment within his restrictions?
 * * * * * * * * * * * FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff, Paul H. Cullifer, was 57 years old. He is high school educated with a two-year associate's degree in accounting. *Page 3 
2. The plaintiff began working for the defendant in 1989. His job has involved working as part of a driving team that transported and delivered grocery products.
3. On March 9, 2001, the plaintiff sustained an injury to his head when he was at a delivery site and a steel "load lock" bar fell striking him on the front portion of his head. He received medical treatment at the emergency department of Cape Fear Valley Hospital, where the treating physician diagnosed a concussion and scalp contusion. The plaintiff did not report any problems with his neck or that he was experiencing any loss of hearing.
4. The plaintiff was removed from work and the defendant admitted plaintiff's right to compensation for an injury to his head through an I.C. Form 60.
5. Two weeks after the incident, the plaintiff returned to work in a light duty capacity performing various clerical and administrative tasks. In May 2001, he returned to work as a truck driver and over the next three years, he periodically worked either in a light duty capacity, performing administrative tasks or full duty as a truck driver.
6. The plaintiff last worked for the defendant on April 7, 2004, and since that time he has not worked for any employer.
7. In the months immediately following the March 9, 2001 incident, the plaintiff received follow-up treatment through various physicians of Halifax Regional Medical Center. He was first seen on March 13, 2001, at which time he reported symptoms consisting of intermittent headaches and tingling on the right side of his face, running down the right portion of his neck. The plaintiff denied any neck pain or stiffness and his physical examination on that day showed plaintiff's neck was supple and had complete range of motion. The plaintiff received treatment for his intermittent headaches. *Page 4 
8. The plaintiff remained treating with Halifax Regional Medical Center through July 31, 2001. The office notes show that plaintiff continued to report intermittent headaches along with tingling sensations running into his neck; however, his physical examinations revealed a supple neck with full range of motion.
9. In July 2001, the plaintiff unilaterally sought treatment from orthopedic surgeon Dr. J. Th. Bloem, and during an initial examination, Dr. Bloem noted that in addition to the plaintiff's lingering headaches, the plaintiff exhibited a good range of motion in the neck, but some muscle stiffness. Out of concern that the headaches might be related to the plaintiff's neck complaints, the doctor recommended that the plaintiff participate in a round of physical therapy. The plaintiff did so, and in the meantime, at his request, was sent for a neurological evaluation by Dr. Michael J. Kushner.
10. The plaintiff began treating with Dr. Kushner in September 2001. Dr. Kushner's office notes show that the plaintiff's primary complaints continued to be dull headaches with some facial tingling. Dr. Kushner's ongoing diagnoses throughout his treatment of the plaintiff were post concussion syndrome and post-traumatic cranial neuropathy. There is no indication that the doctor provided the plaintiff with any specific treatment for his neck.
11. The plaintiff's headaches continued into January 2002. During an office visit on January 15th, Dr. Kushner noted a sense of bewilderment over the ongoing symptoms, and he referred the plaintiff to an oral surgeon on the possibility that the headaches were be due to TMJ syndrome.
12. The plaintiff was seen by oral surgeon, Dr. Gene Glover, on January 25, 2002. Dr. Glover diagnosed myofascial pain with spasms of the temporalis muscle or possible micro neuromas of the terminal ends of a cranial nerve. The plaintiff received some additional physical *Page 5 
therapy; however when he reported little improvement in his symptoms, Dr. Glover felt that the plaintiff may be suffering from micro neural disease and he released the plaintiff to return to Dr. Kushner. Dr. Kushner, in turn, noted that he had no further treatment recommendations, but suggested that the plaintiff may benefit from an evaluation at a multidisciplinary pain center.
13. The plaintiff's care was transferred to the Duke Pain Clinic in Durham, and he began seeing several physicians at that facility beginning in June 2002. He continues to receive care at the Duke Pain Clinic and his treatment since 2002 has been coordinated primarily through various neurologists including Dr. Sashidahr Kori (who treated plaintiff from June 2002 to December 2002); Dr. Randall Brewer (who treated plaintiff from December 2002 to October 2003); and Dr. Sonia Pasi (who has been treating plaintiff since February 2004).
14. In August 2002, Dr. Kori ordered a cervical MRI, the results of which returned normal.
15. As of the date of the hearing before the Deputy Commissioner, defendant had authorized and the plaintiff had continued to receive treatment at the Duke Pain Clinic under the direction of Dr. Pasi. In general his treatment has been through various conservative modalities designed to address his chronic headaches, including biotherapy sessions, acupuncture, physical therapy, botox injections and nerve block injections, as well as periodic office visits with Dr. Pasi.
16. In August 2004, Dr. Pasi ordered repeat brain and cervical MRIs. The cervical MRI results were unremarkable. Near the same time, Dr. Pasi also ordered a repeat cervical x-ray, the results of which showed multiple degenerative disc disease from the C4 to the C7 levels.
17. Dr. Pasi has opined that the plaintiff's headaches are due to the head injury plaintiff sustained on March 9, 2001. Defendant continues to authorize treatment for this *Page 6 
specific condition through Dr. Pasi. The Full Commission finds that the plaintiff's treatment, which is being provided by Dr. Pasi, is reasonably designed to provide him with relief from the head injury he sustained on March 9, 2001.
18. Dr. Pasi opined that the plaintiff suffers from osteoarthritis of the neck, which occurred over a gradual period of time, considering the diagnostic studies performed in 2001, which showed no evidence of degenerative changes, as well as the more recent studies performed in 2004, which showed multilevel degenerative disc disease. Dr. Pasi further opined, and the Full Commission finds as fact, that the plaintiff's cervical disc disease and joint disease were the contributing factors in his neck pain.
19. Dr. Pasi referred the plaintiff for a functional capacity evaluation (FCE) on March 16, 2006 to determine his physical abilities and limitations. The FCE also measured the reliability of plaintiff's reports of pain and concluded that plaintiff's subjective reports of pain were reasonable and reliable. The results of testing of his physical limitations showed that the plaintiff was capable of performing in a job with a Low/Medium Work Load Classification as defined by the Dictionary of Occupational Titles. During the evaluation, the plaintiff demonstrated the ability to lift up to 30 pounds on an occasional basis. Although the evaluator noted that this would preclude the plaintiff from returning to work as a truck driver, she made no suggestion that the plaintiff was incapable of returning to any work. During the examination plaintiff exhibited a significant level of drowsiness and decreased concentration. His walking and stairway balance were affected by his drowsiness.
20. Dr. Pasi's medical note of March 23, 2006, a few days after the FCE, indicated that the plaintiff reported significant drowsiness, decreased concentration, and decreased ability to comprehend due to sedation, which had worsened over the prior three months. Plaintiff also *Page 7 
had slurred speech during part of the visit and demonstrated a lot of confusion and difficulty with remembering things. Dr. Pasi began a plan of tapering the plaintiff off some of his medication. During the next two visits on May 3, 2006, and June 19, 2006, plaintiff continued to have his medications adjusted, which resulted in worsening headache pain, but he reported feeling more alert. Dr. Pasi continued to note that plaintiff was waiting approval from the insurance company of a peripheral nerve stimulator trial.
21. Dr. Pasi did not record in her March, May or June 2006, medical notes following the FCE that she was releasing the plaintiff to return to work in any capacity. Dr. Pasi testified that she told the plaintiff from the time she started treating him that she would not be able to make a determination of what he could or could not do. She testified that her recommendations would be based on a functional capacity evaluation. The first time she gave an opinion on plaintiff's ability to work was at her deposition on July 26, 2006. Dr. Pasi was asked:
 Q. And I take it, Doctor, that you'd be comfortable allowing Mr. Cullifer to go back to a job that was consistent with the results of the functional capacity evaluation?
 A. I would — yes. I would be more comfortable going along with the recommendations that were made by them.
22. Based upon the greater weight of the evidence, the Full Commission finds that although plaintiff had the physical capability to work based upon the FCE results, he was still unable to engage in competitive employment due to his diminished capacity to function related to his medication. Also, the hearing in this matter was held on March 10, 2006, which was prior to the FCE. There has been no reasonable opportunity for the plaintiff to present evidence of job search efforts in this record or to establish that a job search would be futile.
23. Approximately one year after the March 9, 2001, incident the plaintiff reported having difficulty hearing in his right ear. Since 2002, he has undergone at least four audiologic *Page 8 
evaluations, which essentially have shown diminished hearing in both ears, with a greater loss of hearing in his right ear. Although a recommendation has been made that the plaintiff be fitted for two hearing aids, he has presented no expert evidence showing that his hearing loss beginning in 2002 is due to any injury he sustained in the March 9, 2001, incident.
24. In an effort to determine whether the plaintiff's hearing loss had a neurological component, Dr. Pasi referred him for the performance of a Brainstem Auditory Evoked Response (BAER) test. Dr. Pasi specifically noted during her deposition that the results of the BAER test showed "there were no brain damages or changes" that could explain the hearing loss, and she further opined that the hearing loss was likely from an intra aural source, meaning a source inside plaintiff's ears. The Full Commission, therefore, finds as fact that there is no competent expert evidence in the record to support a finding that the onset of the plaintiff's hearing loss, which began to occur in 2002, was due to any injury he sustained in the March 9, 2001, incident.
25. In May 2003, the plaintiff and his wife sought marital counseling from psychologist Barry Chesis, M.A. Mr. Chesis did not testify in this matter and a review of his treatment notes indicates that his initial counseling sessions were with the plaintiff and his wife and were primarily devoted to addressing and assisting them with working through certain marital issues.
26. Both the plaintiff and his wife testified at the hearing and neither one testified that the head injury plaintiff sustained in the March 9, 2001, incident placed an undue or extraordinary stress on their marriage.
27. References are made throughout Ms. Chesis' records suggesting that his individual sessions with plaintiff addressed a variety of personal problems and life changing events unrelated to the March 9, 2001, incident, including his relationship with his wife, his *Page 9 
relationship with his former work partner, the death of his father-in-law, and the need for the plaintiff's wife to care for an ailing mother.
28. The plaintiff was not referred to Dr. Chesis by any of his authorized treating physicians, and the evidence is unclear whether the counseling being provided by Dr. Chesis is directly attributable to the injury the plaintiff sustained in the March 9, 2001, incident. The Full Commission therefore finds that there is insufficient competent expert evidence in the record to support a finding that the counseling sessions the plaintiff received and continues to receive from Mr. Chesis are reasonably designed to effect a cure or provide the plaintiff with relief from any mental health injury he sustained in the March 9, 2001, incident.
 * * * * * * * * * * *
Based on the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On March 9, 2001, plaintiff sustained an injury by accident to his head arising out of and in the course and scope of his employment with the defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendant admitted the plaintiff's right to compensation for the head injury he sustained on March 9, 2001, and the plaintiff is entitled to a presumption that any further medical treatment for his head is causally related to the March 9, 2001, incident. Perez v. AmericanAirlines, 174 N.C. App. 128, 620 S.E.2d 288 (2005). The competent, credible evidence in the record establishes that the plaintiff continues to experience chronic headaches that are directly attributable to the March 9, 2001, incident. The defendant has not overcome plaintiff's presumption of entitlement to further medical treatment for this condition. *Page 10 
3. Plaintiff contends that he is also entitled to additional medical treatment in the form of additional physical therapy for his neck, audiological treatment for his loss of hearing, and psychological counseling through Mr. Barry Chesis. There is no presumption that these conditions are causally related to his compensable injury. The presumption only applies to treatment for the "very injury" or condition that previously was found or admitted to be compensable. Clark v. SangerClinic, P.A., 175 N.C. App. 76, 623, S.E.2d 293 (2005). Defendant has not admitted to the compensability of any injury plaintiff sustained to his neck in the March 9, 2001, incident, nor has it accepted any liability for plaintiff's hearing loss or development of mental health problems. Accordingly, the burden remains upon plaintiff to show the causal relationship between these conditions and the March 9, 2001, injury by accident.
4. Regarding issues of medical causation, our Supreme Court has held that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v.Freight Carriers, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). The requisite degree of proof is by the "greater weight" or "preponderance" of the evidence, and any causative expert opinion regarding whether the requested medical treatment is directly attributable to a compensable injury must rise above the level of mere speculation of conjecture.Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v.Hickory Bus. Furn., 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000);Ballenger v. ITT Grinnell Indus. Piping, Inc., 320 N.C. 155,357 S.E.2d 683 (1987). Plaintiff has not established by the greater weight of the competent medical evidence that his neck condition, hearing loss and psychological problems are casually related to the March 9, 2001, injury by *Page 11 
accident. Accordingly, his request for medical treatment for these conditions must, under the law, be denied.
5. Our appellate courts have also held that "[i]n order to obtain compensation under the Workers' Compensation Act, the claimant has the burden of proving the existence of his disability and its extent."Effingham v. The Kroger Company, 149 N.C. App. 105, 111, 561 S.E.2d 287,292 (2003), quoting, Hendrix v. Linn-Corriher Corp., 317 N.C. 179, 185,345 S.E.2d 374, 378 (1986). The burden of showing an ongoing disability remains the claimant's even in instances, such as in this case, where the defendant admits the compensability of an injury through an I.C. Form 60 and initiate payment of temporary total disability benefits.See, Clark v. Wal-Mart, 360 N.C. 41, 44, 619 S.E.2d 491, 493 (2005). In order to meet this burden, a claimant must demonstrate each of the following three elements: (1) an incapacity after the injury of earning the same wages earned prior to the injury in the same employment; (2) an incapacity of earning the same wages earned prior to the injury in any other employment; and (3) that the incapacity to earn wages is causally related to a compensable injury. See N.C. Gen. Stat. § 97-2(9);Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982);Dalton v. Anvil Knitwear, 119 N.C. App. 275, 458 S.E.2d 251 (1987); andRussell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993).
6. The evidence necessary to establish the second Hilliard element, at a minimum, must take one of the following forms: (1) competent medical evidence that the claimant is physically or mentally unable to work in any employment as a result of the work-related injury; (2) evidence that the claimant is capable of some work, but has, after engaging in a reasonable effort, been unable to obtain employment; (3) evidence that the clamant is capable of some work, but that it would be futile because of some pre-existing condition such as age, inexperience, or *Page 12 
lack of education, to seek other employment; or (4) evidence that the claimant has obtained alternative employment at wages less than that earned prior to the injury. See Russell, 108 N.C. App. at 765-66,425 S.E.2d at 457; and Grantham v. R.G. Barry Corp., 115, N.C. App. 293,444 S.E.2d 659 (1994).
7. The evidence in this record shows that an FCE on March 16, 2006, showed that the plaintiff was physically capable of working in a job with a Low/Medium Work Classification as identified in the Dictionary of Occupational Titles and that the evaluator discussed the FCE results with the plaintiff. The FCE recommendations were submitted to Dr. Pasi; however, there is no evidence establishing that Dr. Pasi released the plaintiff to return to work at any time thereafter. The greater weight of the evidence establishes that although plaintiff had the physical capability to work based upon the FCE results, he was still unable to engage in competitive employment due to diminished functioning capacity resulting from his medication as more fully set forth in the findings of fact above. Dr. Pasi did not give her opinion on plaintiff's ability to work until her deposition was taken on July 26, 2006. By that time the hearing before the Deputy Commissioner had already occurred and plaintiff has not had an opportunity in this record to present evidence on when he was reasonably able to look for work after being released to return to work, whether he has made a reasonable effort to seek suitable employment or whether an attempt to return to work on his part would be futile. Accordingly, the Full Commission is unable to determine plaintiff's disability after July 26, 2006, and the record should be reopened for the presentation of additional evidence on plaintiff's disability after this date. *Page 13 
8. Since the plaintiff cannot return to his prior work as a truck driver, he would benefit from vocational rehabilitation assistance from defendant to aid him in locating suitable employment.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. The plaintiff's request for ongoing medical treatment through Dr. Sonia Pasi for his chronic headaches is GRANTED.
2. The plaintiff's request for medical treatment for his neck condition, hearing loss and psychological problems is DENIED.
3. Defendant may suspend payment of ongoing temporary total disability benefits to plaintiff until further order of the Commission after additional evidence is presented on plaintiff's disability after July 26, 2006.
4. This case is remanded to the Deputy Commissioner Section for the taking of additional evidence on the issue of plaintiff's disability after July 26, 2006, including evidence of defendant's efforts to provide vocational rehabilitation assistance to plaintiff. The Deputy Commissioner shall gather the evidence and submit it to the Full Commission for further decision.
5. Defendant shall pay the costs due the Commission.
This the ___ day of January 2008. *Page 14 
 S/______________________
 BERNADINE S. BALLANCE
 COMMISSIONER
CONCURRING:
S/______________________ LAURA K. MAVRETIC COMMISSIONER
S/______________________
BUCK LATTIMORE
 COMMISSIONER *Page 1