CATHERINE LEE DALTON, Employee, Plaintiff v. ANVIL KNITWEAR, Employer and NATIONAL UNION FIRE INSURANCE COMPANY, Carrier; Defendants

No. COA94-726

(Filed 20 June 1995)

**Workers' Compensation § 341 (NCI4th)— agreement for compensation entered into by parties—termination of benefits—error**

The Industrial Commission erred in concluding that plaintiff's compensable injury did not cause her current disability and that plaintiff was not entitled to receive further disability benefits, since the parties had previously entered into an Agreement for Compensation for Disability which had been approved by the Commission, and the sole issue before the Commission therefore was whether plaintiff's disability compensation should continue, not whether her alleged disability was the result of her accident.

**Am Jur 2d, Workers' Compensation §§ 513-316.**

Appeal by plaintiff from Opinion and Award of the North Carolina Industrial Commission filed 4 April 1994. Heard in the Court of Appeals 23 March 1995.

DALTON v. ANVIL KNITWEAR

[119 N.C. App. 275 (1995)]

On 5 February 1990, plaintiff, a knitting machine operator, suffered a back injury while "doffing a roll of cloth weighing fifty pounds from a knitting machine." Dr. Donald Mullis examined plaintiff on 21 February 1990 and diagnosed her as having an acute lumbar strain. The parties subsequently entered into an "Agreement for Compensation for Disability" (Industrial Commission Form 21) for plaintiff's back strain which was approved by the Industrial Commission (hereinafter Commission) on 4 April 1990. Defendant carrier paid plaintiff compensation for temporary total disability until 18 October 1991.

On 23 April 1991, defendant applied to the Commission on Industrial Commission Form 24 to stop the payments of temporary total disability. Plaintiff filed a request for hearing on 26 April 1991. Although defendant's application to stop payments was denied on 10 May 1991, plaintiff's claim was assigned for hearing on 18 October 1991. At the hearing, the parties stipulated that plaintiff "sustained an injury by accident arising out of and in the course of her employment on February 5, 1990. The accident resulted in back strain."

On 14 October 1992, Deputy Commissioner Markham issued the following Opinion and Award:

STIPULATIONS

3. Plaintiff sustained an injury by accident arising out of and in the course of her employment on February 5, 1990.

4. The accident resulted in back strain.

5. Plaintiff's average weekly wage was $404.08, yielding a compensation rate of $269.40.

. . . .

FINDINGS OF FACT

1. Plaintiff's compensable injury of February 5, 1990 occurred when in the course of her duties as a knitting machine operator for defendant, she was doffing a 50 pound roll of fabric. She flipped the roll over and felt something pull in her back. Pursuant to the Form 21 agreement between the parties, she was thereafter paid compensation for temporary total disability intermittently and was continuing to be paid such compensation at the time of the hearing. On April 23, 1991 defendant had applied to the Industrial Commission on Form 24 to stop payment of compen-

sation on grounds that "claimant has reached maximum medical improvement, has been rated, and will not be returning to gainful employment due to non-work related problems." The application was denied May 10, 1991. Among other grounds cited by the Commission for the denial as stated June 6, 1991 by the Chief Claims Examiner, was that the evidence was not clear whether the employer was unemployable because of her accident, other factors or a combination of both, matters which would have to be addressed at a hearing because the case by then had been placed on the hearing docket.

2. Plaintiff now 48 years old, completed the eighth grade in school and in 1985 obtained a General Equivalency Diploma. Her employment history includes approximately 20 years in the textile industry in the knitting and spinning departments of various mills. At the time of her injury she had been employed for a second time by defendant about a year and a half. She is married and has four living children in their 20's, the youngest of whom lived at home.

3. Plaintiff is visually impaired and has never had a driver's license. She has a past history of peptic ulcer disease. About 1982 or 1983, plaintiff was treated for a seizure disorder which was then treated with Dilantin. She first experienced seizures when she was a child. She had no further such disorders for about eight years after 1982-1983 and did not require her medication. Between July 1984 and June 1987 plaintiff was treated conservatively by Dr. Donald Mullis for chronic lumbar strain with pain radiating into her right foot, occasioned by incidents in her then employment in 1984 and 1985 at Tandy Manufacturing Company (for which no workers' compensation apparently was ever sought or paid). Dr. Mullis concluded by November 1986 that plaintiff had a chronic recurrent fibromyositis problem. On June 30, 1987, Dr. Mullis rated plaintiff as having a ten percent permanent partial disability of the lumbar spine; released her from his care; and referred her to the back program at Thoms Rehabilitation Hospital. Fibromyositis is a chronic inflammation in the muscles (soft tissue) that is not related to a slipped disc or pinched nerves and is very difficult to treat. As of June 30, 1987 Dr. Mullis expected plaintiff to have continued, recurrent back pain. Patients with a fibromyositis problem may experience periods when they feel fine and then the back begins to hurt again when they become active, even with insignificant activity.

4. Plaintiff was evaluated at Thoms July 28, 1987 but did not at that time enter the program. Dr. Shields and his colleague, Dr. Craig Waggoner, reported their conclusions to Dr. Mullis as follows: "Catherine Dalton is suffering from Chronic pain syndrome secondary to a probably myofascial dysfunction with possibility of a right posterior sacroiliac joint dysfunction. Psychological/behavioral factors appear to be greatly perpetuating and amplifying her complaints of pain and overall symptomatology. Considerable amount of marital dysfunction and current stress is present and contributing to her pain problems." When plaintiff applied to defendant for a job in August 1987, she reported no prior back problems when asked about this in an interview. On her job application form she did not refer to any employment at Tandy or to her visual impairment. On the basis of this application and interview, she was hired by defendant and worked for a short time. She again began working for defendant in late 1988, and was re-hired on the basis of her acceptable performance during the earlier brief period.

5. From March 8 or 9, 1989 through April 17, 1990 plaintiff was intermittently under the care of Dr. F. Alan Thompson, a gastroenterologist. . . . Dr. Thompson diagnosed plaintiff's condition as irritable bowel syndrome, a condition of spasm in the muscles of the intestinal tract that represents a lot of stress in one's life. Plaintiff also had a gastroesophageal reflux (also associated with stress), where acid produced in the stomach washes up into and burns the lower esophagus, causing heartburn and difficulty swallowing. Stooping, bending and lifting are possible irritants to one in such a condition. At one point she had out-patient surgery for this condition. The tailbone pain of which plaintiff had complained was in fact caused by spasms in the intestinal muscles and was related to the irritable bowel syndrome. During the course of his treatment, Dr. Thompson noted on August 28, 1989 that plaintiff appeared to be in a total state of despair; was very disturbed and upset and needed time off from work.

6. After her compensable injury of February 5, 1990, plaintiff was treated conservatively by Dr. Christina McQuiston of St. Joseph's Hospital Urgent Care, and was again seen by Dr. Mullis between February 21, 1990 and March 13, 1990. About April 2, 1990 plaintiff sustained a seizure disorder, the first since 1982 or 1983. On April 9, 1990 plaintiff was first seen on referral from Dr. McQuiston by Dr. Ralph C. Loomis, reporting to him that she had

severe back and right leg pain going into the right foot and great toe. Dr. Loomis' impression was reflex and sensory right S1 and right L5 radiculopathy. Later Dr. Loomis obtained a myelogram, CT scan, and EMG and nerve conduction studies of plaintiff's back, all of which were normal. No neurosurgical intervention was thought to be appropriate. Plaintiff returned to work July 12, 1990 for a few days, but had difficulty doing the work because her pain had returned, and she was released from work by Dr. McQuiston.

7. On referral from Dr. McQuiston, plaintiff was evaluated at Thoms Rehabilitation Hospital September 4, 1990 and remained under the care of Dr. Charles R. Shields there through June 28, 1991. During the course of her treatment at Thoms, plaintiff made two attempts at suicide, one in late September 1990, as a result of which she was treated at Appalachian Hall until October 17; and another in March 1991 as a result of which she was confined to the psychiatric ward of St. Joseph's Hospital for a weekend. Between January 23, 1991 and March 27, 1991 plaintiff was seen several times by Dr. Ed Entmacher, a psychiatrist at Blue Ridge Mental Health Center. Although Dr. Entmacher believed that plaintiff's injury and inability to work were the primary causes of her depression, he was not made aware of the depressed condition that had been observed the previous year by Dr. Thompson. He was aware, however, of the relationship between plaintiff's domestic problems and her emotional state.

8. The initial evaluation of plaintiff at Thoms yielded a diagnosis of low back and right lower extremity pain since February 1990, secondary to myofascial dysfunction, mild degenerative joint and disc disease without neurologic deficit, and significant anxiety and possibly somatiform pain disorder associated with her low back problem, but also with her significant gastrointestinal problems. Significant anxiety and other significant psychosocial factors, hypochondriacal tendencies and histrionic tendencies were noted.

9. In a report to Dr. McQuiston September 4, 1990 Dr. Shields and the Thoms staff psychologist noted that a causal relationship between plaintiff's injury at work and her present symptomatology was "structurally reasonable"; however, plaintiff's symptoms had been maintained past the expected recovery period (of that injury) by perpetuating factors such as generalized decondition-

ing, pain amplification, significant focusing on gastrointestinal problems, sleep deprivation, anxiety and dependent personality characteristics. It was stated that behavioral factors which are perpetuating plaintiff's symptomatology and complicating her recovery and rapid return to work include cognitive and behavioral patterns reinforcing impairment, family enmeshment, history of abuse, moderate to severe anxiety, mild to moderate depression, sleep disturbance, weight gain, somatization and poor awareness thereof and modeling of disability and illness behavior.

10. Plaintiff participated in both inpatient and outpatient programs at Thoms. By December 5, 1990 she was doing very well. On January 9, 1991 Dr. Shields' final diagnosis was consistent with her admitting diagnosis. He believed plaintiff had reached maximum medical improvement from a pain management and return to work standpoint. She was given a rating of seven percent permanent partial disability of the back.

11. On January 30, 1991 plaintiff had a significant flare-up of low back and bilateral lower extremity pain without any obvious new clinical findings and with strong behavioral components and psychosocial components. Plaintiff requested a second opinion of her back and returned to Dr. Loomis, who, on February 18, 1991 concluded that her back and leg problems did not warrant any further pursuit and noted she would have to put up with her back and lower extremity pain at the current time. Her flare-ups and seizures continued in March and April.

12. Dr. Shields released plaintiff from care June 28, 1991. He noted on that date: "Because of the combination of her visual impairment which is more than just an acuity problem, her persistent back pain, and her fragile behavioral status, I believe she is not gainfully employable at any level and should be considered a reasonable candidate for Social Security disability." On the same date Dr. Shields wrote to plaintiff's primary care physician, Dr. John Kelly, as follows: "(Ms. Dalton) is now at a stable state and has a better control over her pain, though it does not appear that it is going to resolve to a point that she can return to any gainful employment. The combination of the pain, her visual perceptual deficits, and her fragile behavioral condition is significant enough to preclude any ability to maintain long-term gainful employment."

13. The seven percent disability rating given plaintiff by Dr. Shields is less that [sic] the degree of impairment of ten percent which plaintiff was assigned in 1987 after her injuries while in the employ of another employer in 1984 and 1985. No additional permanent impairment was occasioned by her compensable injury February 5, 1990.

14. While plaintiff has established through her own accounts of her present condition and through the observations of Dr. Shields that she is currently incapable of earning wages in any employment, including her former employment for defendant (taking into account her age, limited education and training, physical limitations, and work experience involving only physical labor in the textile industry), the compensable accident of February 5, 1990 must be considered in light of a number of her preexisting non-work related disabling conditions (including emotional difficulties), and did not substantially or significantly and proximately contribute to her present disability.

Based upon the findings of fact, The Full Commission concludes as follows:

## CONCLUSIONS OF LAW

In order to support a conclusion of disability, the Industrial Commission must find: (1) that plaintiff was incapable after her injury of earning the same wages she had earned before her injury in the same employment, (2) that plaintiff was incapable after her injury of earning the same wages she had earned before her injury in any other employment, and (3) that this incapacity to earn was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593 (1982); Hendrix v. Linn-Corriher Corp., 78 N.C. App. 373 (1985), aff'd in part and rev'd in part, 317 N.C. 179 (1986). The rule of causation is the very sheet anchor of the Workers' Compensation Act. Duncan v. City of Charlotte, 234 N.C. 86 (1951); Perry v. American Bakeries, 262 N.C. 272 (1964). Here, plaintiff has not shown that her compensable accident of February 5, 1990 caused in a significant way her current disability.

Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:

A W A R D

1. Plaintiff is not entitled to any further benefits under the Workers' Compensation Act.

2. Defendants' application on Form 24 to terminate payment of compensation is APPROVED.

On 4 April 1994, the Full Commission adopted as its own the Deputy Commissioner's Opinion and Award and affirmed the Deputy Commissioner's holding. Plaintiff appeals.

*Eleanor MacCorkle for plaintiff-appellant.*

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Marla Tugwell Adams, for defendant-appellee.*

EAGLES, Judge.

Plaintiff brings forward three assignments of error. After careful review of the record and briefs, we reverse and remand.

Plaintiff first contends that the Commission erred in terminating her disability benefits by finding her accident was not a significant cause of her continuing disability. We agree.

We note initially that the parties entered into an Agreement for Compensation for Disability (Industrial Commission Form 21), which was approved by the Commission on 9 April 1990. Plaintiff was paid compensation for temporary total disability beginning 1 March 1990 and continuing until the date of the hearing on 18 October 1991. G.S. 97-82 provides that an agreement for the payment of compensation approved by the Commission is enforceable by a court decree. "An agreement for the payment of compensation, when approved by the Commission, is as binding on the parties as an order, decision or award of the Commission unappealed from." *Brookover v. Borden*, 100 N.C. App. 754, 756, 398 S.E.2d 604, 606 (1990). Once an agreement for compensation has been approved by the Commission, "no party . . . shall thereafter be heard to deny the truth of the matters therein set forth, unless it shall be made to appear . . . that there has been error due to fraud, misrepresentation, undue influence or mutual mistake . . . ." G.S. 97-19.

On 23 April 1991, defendant applied to the Commission on Industrial Commission Form 24 to stop payment of compensation on the grounds that "claimant has reached maximum medical improve-

**DALTON v. ANVIL KNITWEAR**

[119 N.C. App. 275 (1995)]

ment, has been rated, and will not be returning to gainful employment due to non-work related problems." In its Conclusions of Law, the Commission held that plaintiff "ha[d] not shown that her compensable accident of February 5, 1990 caused in a significant way her current disability." The sole issue before the Commission, however, was whether plaintiff's disability compensation should continue, not whether her alleged disability was the result of her accident. *Radica v. Carolina Mills*, 113 N.C. App. 440, 448, 439 S.E.2d 185, 190 (1994); *Lucas v. Thomas Built Buses*, 88 N.C. App. 587, 591, 364 S.E.2d 147, 150 (1988). Here, defendant has admitted liability under the Workers' Compensation Act by signing the Industrial Commission Form 21 agreement for disability compensation. Defendant cannot now deny that plaintiff's compensable back injury is not a significant cause of her current disability, G.S. 97-17; *Radica*, 113 N.C. App. at 448, 439 S.E.2d at 190; *Lucas*, 88 N.C. App. at 591, 364 S.E.2d at 150, in the absence of an independent intervening cause attributable to claimant's own intentional conduct. *Heatherly v. Montgomery Components, Inc.*, 71 N.C. App. 377, 379-80, 323 S.E.2d 29, 30 (1984).

G.S. 97-2(9) defines disability as an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." In order to find that a worker is disabled under the Act, the Commission must find:

(1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment,

(2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and

(3) that this individual's incapacity to earn was caused by plaintiff's injury.

Initially, claimants must prove the extent and degree of their disability, but once the disability is proven, there is a presumption that the disability continues until "the employee. returns to work at wages equal to those he was receiving at the time his injury occurred." *Watson v. Winston-Salem Transit Authority*, 92 N.C. App. 473, 475-76, 374 S.E.2d 483, 485 (1988) (quoting *Watkins v. Motor Lines*, 279 N.C. 132, 137, 181 S.E.2d 588, 592 (1971)).

Plaintiff contends that the Commission failed to apply this presumption. We agree. Plaintiff has met her initial burden of proving

disability. Defendant admitted liability pursuant to the approved Industrial Commission Form 21 settlement agreement. Plaintiff began receiving temporary total disability payments pursuant to the settlement agreement on 1 March 1990 and was continuing to receive payments until the date of the hearing. After plaintiff has met her initial burden, the burden shifts to defendant to show that plaintiff is employable. *Radica*, 113 N.C. App. at 447, 439 S.E.2d at 190. The Commission's findings of fact and conclusions of law do not indicate that plaintiff was capable of earning the same wages that she had earned prior to the injury. Defendant has failed to overcome the presumption of disability.

Although the issue of causation was not properly before the trial court, we note that the aggravation of an injury or a distinct new injury is compensable "[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct." *Heatherly v. Montgomery Components, Inc.*, 71 N.C. App. 377, 379-80 (1984) (quoting *Roper v. J. P. Stevens & Co.*, 65 N.C. App. 69, 73, 308 S.E.2d 485, 488 (1983)). An "intervening cause" in the context of the Workers' Compensation Act is an occurrence "entirely independent of a prior cause." *Petty v. Transport, Inc.*, 276 N.C. 417, 426, 173 S.E.2d 321, 328 (1970). We find no evidence in the record that plaintiff's pre-existing symptomatology acted as an independent, intervening cause of her current disability that was not in some way triggered by her compensable injury.

Accordingly, we hold that the Commission erred in concluding that plaintiff's compensable injury did not cause her current disability and that plaintiff was not entitled to receive further disability benefits. We reverse the Commission's Opinion and Award and remand to the Commission to determine whether plaintiff is employable and capable of earning wages equal to those she was receiving prior to her injury.

Reversed and remanded.

Judges MARTIN, JOHN C., and WALKER concur.