The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence, the undersigned reach different facts and conclusions than those reached by the Deputy Commissioner. Accordingly, the December 6, 1995 Opinion and Award by Deputy Commissioner Cramer is HEREBY REVERSED AND VACATED. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
The parties entered into a pretrial agreement dated October 6, 1994, which is incorporated by reference. The agreement acknowledges plaintiff sustained a compensable injury by accident for which benefits have been paid at the rate of $257.35 per week, and that the issue before the undersigned is whether plaintiff is entitled to temporary total disability benefits since February 2, 1994.
* * * * * * * * * * *
Based upon the competent and convincing evidence adduced at the initial hearing, the undersigned make the following additional
FINDINGS OF FACT
1. Plaintiff was born in Iran on September 9, 1947. Plaintiff is well-educated, having completed college with a degree as a Family Counselor from Tehran University.
2. Plaintiff came to the United States in October 1982. He worked at Hardees from 1983 to 1985. After he left Hardees he worked briefly for a few months part-time with a friend cleaning offices.
3. Plaintiff speaks English, although it is somewhat broken. He has some difficulties reading and writing.
4. Plaintiff began working as a stock clerk for the defendant Winn-Dixie in August 1985. That job included unloading trucks and stocking the shelves. After about two years, he became a junior assistant manager. In that position he did stocking of shelves, set up displays, cleaned the store, including buffing the floor, and closing the store if the manager was not in, which included taking care of money. He might lift up to 60 pounds. Plaintiff was working at least 40 hours per week in October 1992.
5. On October 7, 1992 plaintiff suffered an injury to his back which defendant has accepted as compensable pursuant to a Form 21 approved by the Commission on November 6, 1992. As he was unloading a box of cat food, he felt a sharp pain in his back and legs.
6. The morning following the injury, plaintiff told his wife he could not move and they called an ambulance. He was taken to Rex Hospital where he was seen by Dr. Goodnough, an orthopaedic surgeon. Dr. Goodnough believed he had a herniated disc and referred him for a neurological evaluation by Dr. Kenneth J. Rich, neurosurgeon. An MRI showed a herniated disc at L5-S1 and Dr. Rich performed surgical excision of the disc material at L5-S1 on November 30, 1992.
7. Following the surgery, plaintiff's leg pain improved, but he continued to complain of back and hip pain. He went to physical therapy in Johnston County for about 12 visits. Plaintiff felt he could not do the physical therapy because it caused too much pain.
8. Around February 2, 1993, an MRI scan was done which showed a bulge at L4-5. Dr. Rich suggested a myelogram, which plaintiff did not want done. The myelogram was eventually done in May, 1993, and Dr. Rich found it showed a new rupture at L4-5, which was probably the cause of plaintiff's pain. Dr. Rich explained to plaintiff the options of surgery or conservative therapy such as physical therapy. Plaintiff did not want surgery, and so Dr. Rich released him on May 18, 1993 since he had nothing further to offer the plaintiff. Dr. Rich told plaintiff if he got worse to call him. Plaintiff did not return to see Dr. Rich.
9. Plaintiff had access to a swimming pool and during the spring and summer of 1993, he would swim for therapy, as Dr. Rich had recommended.
10. On July 27, 1993, plaintiff saw Dr. James S. Fulghum for an independent medical evaluation. Dr. Fulghum suggested a conditioning program to rehabilitate himself as much as possible. Between the time he last saw Dr. Rich and July 27 when he saw Dr. Fulghum, plaintiff's condition improved some, and his pain decreased slightly.
11. Around September, 1993, the employer sent three job descriptions to Dr. Rich to review: an information clerk also called a greeter, a demonstrator, and a stock clerk assistant. All three were light duty temporary alternative jobs in which the maximum weight required to be lifted was five pounds. Although each position required frequent standing and walking, they also allowed for occasional sitting. The job description for stock clerk assistant stated "Associate is responsible for maintaining neat, orderly general merchandise shelves, determining correct price sign, replacement of missing signs, or incorrect signs."
12. Dr. Rich reviewed these three job descriptions and concluded they were good offers of jobs for the plaintiff since a back patient should be able to perform these jobs. Dr. Rich noted there was no neurosurgical reason the plaintiff could not work.
13. After receiving approval from Dr. Rich for plaintiff to try any of these three temporary positions, on October 7, 1993, Danny Trivette, store manager and plaintiff's supervisor, called plaintiff to discuss his return to work. Trivette advised plaintiff that Dr. Rich had released him to return to any of the three jobs. Plaintiff denied that Dr. Rich was his treating physician, but did not give Trivette the name of any other physician to contact. Trivette read each of the job descriptions to plaintiff. As a junior assistant manager at Winn-Dixie for over two years, plaintiff would be familiar with the duties of these positions. Plaintiff told Trivette he was unable to work because he was in too much pain, and plaintiff did not return to work.
14. Plaintiff went to see Dr. Peter Goodnough on October 29, 1993. Dr. Goodnough prescribed physical therapy and nonnarcotic medications. Dr. Goodnough also had an opportunity to review the three job descriptions. Although Dr. Goodnough stated his opinion that plaintiff was temporarily disabled at that time, he acknowledged there was no orthopaedic reason plaintiff could not do the three jobs. He believed that the plaintiff could not return to work due to his pain, which Dr. Goodnough acknowledged is a subjective complaint.
15. In 1991 plaintiff had some difficulties in communicating with associates and customers. His English is still somewhat broken. Recognizing plaintiff's lack of communication skills, the positions of greeter and demonstrator would not be the best choices for plaintiff. However, his limited skill in these areas would not prevent plaintiff from doing either the job of greeter or of demonstrator from a language point of view. Furthermore, lack of communication skills would not prevent the plaintiff from doing the job of stock clerk assistant since this position did not focus on customer relations, but involved maintaining the neat orderly appearance of merchandise shelves along with correct pricing information. The problem with performing these jobs rests on the extent of plaintiff's pain. The undersigned accept plaintiff's complaints of pain as credible and convincing.
16. A Form 24 filed by defendants was approved by the Commission on January 26, 1994.
17. Plaintiff previously played soccer and in the spring of 1994, he began coaching his daughter's soccer team. The soccer games would last 40 minutes. This was a recreational activity in which plaintiff voluntarily chose to participate. Plaintiff was observed and videotaped as he coached his daughter's soccer team on April 9, 1994 and April 16, 1994.
18. The videotape of plaintiff's activity on April 9 is just over 25 minutes long. On that date, plaintiff was moving freely and was in no apparent distress. He engaged in the following physical activity, showing no signs of obvious discomfort: walking consistently and jogging a few paces at a time, kicking the soccer ball, bending at the waist to pick up the soccer ball and roll it, raising his arms to shoulder height and gesturing, raising his arms overhead to catch and throw the soccer ball, raising his right foot to knee height and touching it with his left hand (a movement consistent with that required for climbing stairs), and sitting cross-legged on the ground.
19. On April 16, the video shows plaintiff's activity for 16 minutes. On this date, plaintiff was also moving about freely with no apparent distress. Again, he walked and jogged, raised his arms to shoulder height and above, threw the soccer ball, and bent over at the waist to pick up the soccer ball. Plaintiff also raised both arms over his head and rested them on top of his head for at least eight seconds, and knelt to the ground on one knee, staying in the kneeling position for at least 15 seconds. Since plaintiff testified that the games lasted 40 minutes, plaintiff was engaging in this type of movement for at least 40 minutes, not including any warm-up time or breaks.
20. In his Answers to Interrogatories dated April 29, 1994, plaintiff states "I cannot climb, balance, stoop, kneel, crouch, reach, handle (lift) without pain." While the videotape depicts these activities for a relatively short period of time, it is not indicative of plaintiff's extent of pain following such activity or the extent of plaintiff's ability to perform these activities for more than forty minutes at a time. Dr. Goodnough felt he could not stand for a prolonged period of over 45 minutes due to his pain.
21. Dr. Goodnough did not view the videotape in question, but rather he was given a description of activities on the videotape by defense counsel. Dr. Goodnough felt that following such activities described and with a pain level plaintiff presented with, it would not be unusual for plaintiff to be bedridden for a couple of days. This was, indeed, the case with plaintiff.
22. Plaintiff's refusal to return to one of the positions offered by defendant was reasonable and/or justified due to his continuing pain and the temporary nature of the jobs. While he had the ability to stand, walk, jog, reach, and kneel as depicted on the video, for 40 minutes or so, this activity is not indicative of plaintiff's wage-earning capacity or ability to perform these activities full time throughout the day for a successive number of days. In fact, plaintiff admitted that following the activities with his daughter's soccer team, he had to take to the bed to recover.
23. Plaintiff has reached his point of maximum medical improvement, and it is anticipated his condition will not change unless he elects to have surgery. Plaintiff has not been rated as to any permanent impairment. He may continue to need medications to help control his pain to enable him to work.
24. The temporary alternative jobs offered to plaintiff by defendant-employer were not suitable for plaintiff given their temporary nature and plaintiff's continuing level of pain. Plaintiff was not, at the time of the initial hearing and presumably continuing, capable of earning the same or similar wages as those earned before his injury due to the continuing nature of his pain. Dr. Goodnough felt that even the three temporary job descriptions at Winn-Dixie were beyond plaintiff's capability.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. For an award of total disability benefits to be made pursuant to G.S. 97-29, an employee must be unable to work and to earn any wages. Taylor v. Pardee Hospital, 83 N.C. App. 385,389, 350 S.E.2d 148 (1986). The initial burden is on the plaintiff to prove both the existence of his disability and its degree. Hilliardv. Apex Cabinet Company, 305 N.C. 593, 290 S.E.2d 682 (1982). Defendant here admitted liability under the Workers' Compensation Act by signing the Industrial Commission's Form 21 Agreement, which, once approved and unappealed, became binding upon the parties. Daltonv. Anvil Knitwear, 119 N.C. App. 275, 282-83, 458 S.E.2d 251, 256-57
(1995). Therefore, as plaintiff met his burden, there is a presumption that the disability continues until defendant can meet its burden of showing that plaintiff is capable of being employed at wages which are similar or equal to those he was earning at the time of his injury. Bridges v. Linn-Corriher Corp., 90 N.C. App. 397,399, 368 S.E.2d 388, 390; dis rev. denied, 323 N.C. 171,373 S.E.2d 104 (1988). Defendant must present evidence of a suitable job which plaintiff is capable of obtaining and the undersigned find and conclude that the three temporary alternative jobs did not constitute suitable permanent employment so as to rebut the presumption of disability. Daughtry v. Metric Construction Co.,115 N.C. 354, 446 S.E.2d 590 (1994). In addition, there was no evidence presented by defendant regarding the pay rate or hours of these jobs. In light of the above, the undersigned conclude that the Form 24 was improvidently approved, and such approval is HEREBY SET ASIDE. See Kisiah v. W. R. Kisiah Plumbing, N.C. App. No. COA95-878, Slip op. (filed October 15, 1996.)
2. Plaintiff is entitled to total disability benefits pursuant to G.S. 97-29, for the period of time beginning February 2, 1994, and continuing indefinitely until such time as plaintiff undergoes a change of condition affecting his wage-earning capacity whereby an order for termination may again be sought by defendant. Such amounts as have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
3. Although plaintiff has reached maximum medical improvement, unless he elects to have surgery, he will most likely continue to need medication for pain management.
Plaintiff is entitled to any continuing medical treatment such as pain medication or possible future surgery, so long as it tends to effect a cure or give relief. N.C. Gen. Stat. § 97-25.
4. Plaintiff's counsel is entitled to a twenty-five percent attorney's fee on all accrued amounts and to every fourth check of foregoing total disability payments.
* * * * * * * * * * *
Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
AWARD
1. Defendant shall pay to plaintiff total disability benefits in the amount of $257.35 per week beginning for the week of February 2, 1994, and continuing until further order of the Commission. Such amounts as have accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fee awarded below.
2. Defendant shall continue to pay for any medical treatment for plaintiff to the extent that it tends to effect a cure or give relief.
3. Defendant shall pay to plaintiff's counsel directly the sum of twenty-five percent (25%) of accrued total disability benefits and shall forward directly to plaintiff's counsel every fourth weekly check so long as plaintiff receives such benefits.
4. Defendant shall pay the costs, including an expert witness fee of $250 to Dr. Peter Goodnough.
IT IS FURTHER ORDERED that this claim be REMOVED from the Full Commission docket.
This the __________ day of ________________________, 1996.
 S/ _________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _________________ BERNADINE S. BALLANCE COMMISSIONER
S/ _________________ COY M. VANCE COMMISSIONER
JHB/nwm 10/28/96