***********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 EVIDENTIARY RULINGS
The objections raised by counsel at the depositions taken in these matters are ruled upon in accordance with the law and the opinion in this Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
As to defendant-DUMC (006133), the following stipulations were entered:
1. All parties are properly before the Commission, and this is the Court of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. At all relevant times, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. Duke University is self-insured.
6. All of plaintiff's medical records were received as Stipulated Exhibit 3.
7. All Industrial Commission forms and filings were received as Stipulated Exhibit 4.
8. Plaintiff's average weekly wage was $841.42, yielding a maximum compensation rate for 1999 of $560.00.
9. Plaintiff's alleged date of injury is on or about December 11, 1999.
10. The issues for hearing are: *Page 3 
 • Plaintiff's contested issues:
 1. To what medical and other benefits is plaintiff entitled?
 2. Prior to denial of medical and disability benefits, did defendant fail to conduct "a reasonable investigation based upon all available information?" N.C. Gen. Stat. § 58-63-15.
 3. Is plaintiff permanently and totally disabled from competitive employment?
 4. What sanctions and penalties should be assessed against defendant?
 • Defendant's contested issues:
 1. Whether plaintiff's alleged current disability is related to plaintiff's compensable cervical injury of December 11, 1999, while an employee of defendant-Duke or to the injury plaintiff allegedly sustained while employed with defendant-Gambro, Inc.?
 2. Whether plaintiff had returned to work earning the same or greater wages with a different employer until she sustained a new injury which caused her to be unable to be gainfully employed?
As to defendant-Gambro, Inc. (185383), the following stipulations were entered:
1. All parties are properly before the Commission, and this is the Court of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties. *Page 4 
3. At all relevant times, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. ACE USA was the compensation carrier on the risk.
6. All of plaintiff's medical records were received as Stipulated Exhibit 1.
7. All Industrial Commission forms and filings were received as Stipulated Exhibit 2.
8. Plaintiff's average weekly wage is $920.00, yielding a compensation rate of $613.36.
9. Plaintiff's alleged date of injury is October 3, 2001.
10. Plaintiff's discovery responses were received as Stipulated Exhibit 5.
11. The issues for hearing are:
 • Plaintiff's contested issues:
 1. Did plaintiff suffer a compensable injury by accident or occupational disease in the course and scope of employment with defendant-employer?
 2. To what medical and other benefits is plaintiff entitled?
 3. Prior to denial, did defendants fail to conduct "a reasonable investigation based upon all available information?" N.C. Gen. Stat. § 58-63-15.
 4. Is plaintiff permanently and totally disabled from competitive employment? *Page 5 
 5. What sanctions and penalties should be assessed against defendant(s)?
 • Defendant's contested issues:
 1. Whether employee-plaintiff's alleged current disability results from causes and conditions pre-existing or unrelated to her employment at Gambro, Inc.?
 2. Whether employee-plaintiff has received all benefits to which she is entitled resulting from the incident occurring on October 3, 2001?
 *********** EVIDENCE
In addition to Stipulated Exhibits 1-5, Plaintiff's Exhibit 1, pharmacy printouts, was received into evidence.
 ***********
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Taylor, plaintiff was a 51 year old, right-hand dominant female, born April 25, 1953. Plaintiff is a Registered Nurse and her work experience has consisted primarily of work in that field. Throughout the hearing plaintiff's right arm, hand and fingers twitched and tremored and plaintiff's head tremored.
2. Plaintiff was employed by defendant-DUMC in 1993 as an I.V. nurse. Prior to December 11, 1999, plaintiff had a low back injury in 1995 for which she had undergone *Page 6 
surgery. Plaintiff had undergone conservative treatment relating to her 1995 problems and these problems had resolved prior to December 11, 1999 sufficiently that plaintiff was able to be fully employed as a nurse.
3. On December 11, 1999, plaintiff sustained a compensable specific traumatic neck injury which was the subject of an Opinion and Award filed by Deputy Commissioner W. Bain Jones on November 30, 2001, finding plaintiff's injuries compensable. This decision has become a final Award of the Industrial Commission. Prior to that Award, DUMC denied plaintiff's claim. Plaintiff underwent a cervical right hemilaminectomy performed by Dr. Bronec and she was not given a job by DUMC following her release to return to work after the surgery.
4. At the time of the previous hearing of this matter on September 15, 2000, plaintiff was attempting to return to work in substantially modified employment with Cary Oncology, but was having difficulty performing the work due to increased symptoms relating to the December 11, 1999, specific traumatic incident. Plaintiff began receiving treatment from Blue Ridge Family Physicians on February 8, 2001, when she was seen by Dr. Lee for neck and shoulder pain. On that date, Dr. Lee prescribed Amitriptyline, an antidepressant. Then, on April 4, 2001, Dr. Lee placed plaintiff on Effexor, another antidepressant for her symptoms of depression. Also, on April 4, 2001, Dr. Lee noted that plaintiff was unable to work due to acute and chronic neck pain.
5. Following the previous hearing on September 15, 2000, but prior to the filing of the Opinion and Award on November 30, 2001, plaintiff's employment with Cary Oncology was terminated on April 4, 2001. Plaintiff worked with Cary Oncology from July 2000 until her termination and earned $22.00 per hour, eight hours per day, five days per week. The reason for *Page 7 
plaintiff's discharge was that she was having difficulty performing her job duties due to pain from her work-related injury. Plaintiff had continued neck pain, pain down her right arm and pain up and down her head. She developed tremors in her right arm. DUMC did not provide medical treatment.
6. In the Opinion and Award filed November 30, 2001, Deputy Commissioner W. Bain Jones, Jr., found plaintiff's neck condition to be compensable by DUMC. He awarded medical compensation, temporary total disability compensation from the date plaintiff went out of work until the time she returned to work with Cary Oncology on July 12, 2000, and temporary partial disability compensation thereafter. Deputy Commissioner Jones found that plaintiff's job with Cary Oncology was modified and plaintiff was having difficulty with her job duties. The Opinion and Award did not consider the events following the date of the hearing.
7. Following the November 30, 2001, Opinion and Award, defendant-DUMC paid plaintiff's accrued indemnity and medical benefits. However, defendant-DUMC did not pay plaintiff temporary partial disability benefits or temporary total disability benefits following her failed return to work attempt with Cary Oncology.
8. Plaintiff again attempted to return to work, securing employment on her own with defendant-Gambro, Inc., in July of 2001 as a dialysis team leader.
9. On October 3, 2001, while at a training conference in Charleston, South Carolina for defendant-Gambro, Inc., plaintiff was in her hotel room when she noticed a strong odor of chemical fumes. A commercial drain cleaner had been used in her room, as well as some deodorant sprays. Plaintiff developed severe respiratory irritation and had to be taken to the emergency room of a hospital in Charleston. There, she was treated with bronchodilators and *Page 8 
had a marked improvement in her ability to breathe. Plaintiff had no preexisting pulmonary symptoms.
10. Due to continued pulmonary symptoms, including shortness of breath, plaintiff sought treatment with Dr. Kirsten H. Avery, her primary care physician, at Blue Ridge Family Physicians. Plaintiff presented with acute shortness of breath, and Dr. Avery prescribed inhalers and set up pulmonary function tests with a pulmonologist, Dr. Naseem Masood. Dr. Avery also restricted plaintiff to desk duty until her pulmonary condition resolved.
11. Defendant-Gambro, Inc., accepted as compensable plaintiff's chemical exposure and resulting pulmonary condition on a NCIC Form 60 and paid medical benefits for treatment related to plaintiff's pulmonary condition.
12. Dr. Masood performed pulmonary function tests on the plaintiff. On November 14, 2001, she found obstructive pulmonary abnormalities. Dr. Masood treated plaintiff with steroid and bronchodilator inhalers.
13. Due to the totality of plaintiff's cervical pain, diffuse total body pain, and pulmonary symptoms, plaintiff was unable to maintain production with defendant-Gambro, Inc., and went out of work on December 15, 2001. Plaintiff worked with Gambro from July 9, 2001 through December 15, 2001. Neither defendant-Gambro, Inc., nor defendant-DUMC paid indemnity benefits, though both were informed plaintiff's employment had ended.
14. Because of plaintiff's continued neck pain, Dr. Monaco, of Carolina Pain Consultants, prescribed a TENS unit. Defendant-DUMC refused to authorize the device.
15. On February 5, 2002, due to continued pulmonary symptoms, plaintiff presented to Dr. Robert A. Durr, a pulmonologist. Plaintiff had no prior smoking history and no prior pulmonary problems. He performed pulmonary function tests which revealed possible *Page 9 
obstructive pulmonary disease. He treated plaintiff with inhalers which improved her test results dramatically.
16. In March of 2002, plaintiff continued to treat with Dr. Avery, of Blue Ridge Family Physicians, and Dr. Monaco, of Carolina Pain Consultants. Plaintiff was experiencing worsening neck pain, pulmonary symptoms, depression, and developing insomnia.
17. Dr. Durr's final examination of plaintiff on April 22, 2002 was unremarkable, except for some persistent lower extremity edema. Plaintiff's lungs were clear. Dr. Durr was of the opinion that plaintiff had reached maximum medical improvement at the time of her April 22, 2002 visit and released plaintiff to return to work with restrictions. Dr. Durr instructed plaintiff to avoid extremes of temperatures, strong odors, fumes and any other respiratory irritant. Dr. Durr further stated that there was "no reason that she could not perform full time work on the basis of her pulmonary status alone."
18. Dr. Durr testified that he was retained primarily as a second opinion doctor as to causation and not for treatment. Dr. Durr was of the opinion that plaintiff's October 3, 2001 exposure was a contributor to plaintiff's lung condition. Dr. Durr was of the opinion that plaintiff should continue with her treatment for her chronic obstructive pulmonary disease with mild asthma restrictive airways disease.
19. On April 26, 2002, plaintiff lost her balance and fell down several steps. She was able to pick herself up, but suffered from severe left wrist pain and low back pain on the left side. Plaintiff's emergency room record from April 26, 2002, indicates that the primary injuries caused by the fall were to her left wrist and low back.
20. Plaintiff's pain became more diffuse, and in June 2002 Dr. Monaco, of Carolina Pain Consultants, referred plaintiff to Dr. Kyle W. Strader, a rheumatologist, for treatment. *Page 10 
21. On June 20, 2002, plaintiff presented to Dr. Strader. Plaintiff exhibited all 18 fibromyalgia diagnostic trigger points, and Dr. Strader diagnosed her with fibromyalgia. He prescribed muscle relaxants, sleep aids and other medications.
22. Dr. Strader opined that fibromyalgia is a general central sensitization of the nervous system that causes patients to become over-sensitized to pain. Fibromyalgia is caused by an initial sleep disturbance that can be generally traced back to a particular stressful event. In Dr. Strader's opinion, plaintiff's chemical exposure was more likely than not either the cause or a substantial contributing factor in the development of plaintiff's fibromyalgia in that it was an initial stressful event that led to a sleep disturbance, which in turn caused fibromyalgia.
23. Dr. Strader related that a fibromyalgia patient would expect to be on muscle relaxers, sleep enhancers, antidepressants (including the Cymbalta plaintiff was taking at the time of the hearing before Deputy Commissioner Taylor) and pain medications. In addition, he would always recommend physical therapy and occasional narcotic medications.
24. Finally, Dr. Strader testified that 30% of people with fibromyalgia syndrome have an associated depression and that plaintiff, clearly, had depression.
25. Dr. Strader was of the opinion that plaintiff's fibromyalgia will typically be chronic, waxing and waning and will need to be controlled with medicine, physical therapy and exercise. Dr. Strader was of the opinion that plaintiff was unable to work when he was treating her and would be at any time her fibromyalgia was flaring up. He was unable to proportion plaintiff's disability between her fibromyalgia, cervical condition and lumbar condition.
26. On September 13, 2002, plaintiff presented to Dr. Paul Rieker, Jr., an anesthesiologist, of Carolina Pain Consultants. Her chief complaints were neck and back pain as well as diffuse pain along her cervical spine, shoulders, and low back. Plaintiff was anxious and *Page 11 
had diffuse tremors. Dr. Rieker diagnosed plaintiff with postlaminectomy pain syndrome, chronic myofascial pain with fibromyalgia, depression, and anxiety. He prescribed medications, performed trigger point injections and instructed plaintiff to consult Dr. Avery for her anxiety and depression.
27. In December 2002, plaintiff experienced improvement in her symptoms following a religious experience. She attempted to return to work part-time. On February 4, 2003, plaintiff attempted work with John Umstead Hospital working on the psychiatric ward with four to twelve year olds. Plaintiff was unable to maintain her job duties due to neck and arm pain, tiring out and being out of breath and experiencing memory problems from medications. Plaintiff was terminated by John Umstead on October 23, 2003. Plaintiff did not receive benefits from DUMC or Gambro following her termination. Plaintiff earned $25.00 per hour, eight hours per day, five days per week at John Umstead.
28. Plaintiff continued to treat with Dr. Rieker through June 18, 2003 when she continued to experience diffuse pain and was miserable. Dr. Rieker managed plaintiff's multiple medications. At plaintiff's last visit, Dr. Rieker was of the opinion plaintiff was chronic and needed continuing medical treatment for neck, back and shoulders as well as anxiety and depression.
29. Plaintiff presented to Dr. Erhan C. Atasoy, an anesthesiologist, of Carolina Pain Consultants, on October 31, 2003. Dr. Atasoy found significant myofascial pain over her neck, thoracic spine, and lumbar spine and found plaintiff to be dysfunctional. Dr. Atasoy diagnosed plaintiff with fibromyalgia, depression, and lumbar and cervical pain syndromes. He prescribed multiple medications, water therapy, a therapeutic mattress, performed trigger point injections *Page 12 
and nerve blocks, and referred plaintiff to a psychiatrist. Dr. Atasoy continued to treat plaintiff and manage her prescriptions through November 23, 2005.
30. Defendant-DUMC's workers' compensation adjuster, Delphine Goines, referred plaintiff to Dr. Deborah K. Attix, a clinical neuropsychologist, for evaluation in early 2004. On April 8, 2004, Dr. Attix performed a clinical interview and a brief depression screening and concluded that plaintiff was markedly emotionally distressed with suicidal ideation. Plaintiff was in crisis. Dr. Attix concluded that plaintiff was so distressed that her psychiatric distress would significantly influence her performance on a neuropsychological evaluation. Thus, Dr. Attix thought it would be best to treat plaintiff's emotional distress immediately before proceeding with any neuropsychological evaluation. Dr. Attix obtained an appointment for plaintiff five days later for psychiatric evaluation with Dr. Haresh Tharwani, a psychiatrist. Dr. Attix was of the opinion that plaintiff was disabled from work at the time she saw her.
31. Plaintiff presented to Dr. Tharwani on April 14, 2004. Dr. Tharwani found that plaintiff had a number of depressive symptoms including sleep disturbance, feelings of hopelessness, anger, and frustration. Dr. Tharwani diagnosed plaintiff with major depressive disorder. He treated plaintiff five additional times and modified her medication dosages.
32. On May 4, 2004, Dr. Atasoy prescribed a duragesic patch after taking plaintiff off of the narcotic Kadian. On June 2, 2004, Dr. Atasoy saw plaintiff again. Ms. Gordon was undergoing opiate withdrawal at the time. Defendant-DUMC's adjuster had independently and intentionally halted plaintiff's medications. Dr. Atasoy performed bilateral trigger point injections on plaintiff's trapezius muscles to treat myofascial pain across her shoulders.
33. Dr. Atasoy continued to treat plaintiff throughout the remainder of 2004 and 2005. He managed plaintiff's medications, performed trigger point injections, and nerve blocks. *Page 13 
He also ordered a cervical MRI. This was not initially authorized. When the MRI was authorized, it revealed a large left paracentral disc herniation. Dr. Atasoy thereafter referred plaintiff to a surgeon. Dr. Atasoy also referred plaintiff to Dr. Steven D. Prakken, a psychiatrist, for treatment of her continued depression. Throughout this period, plaintiff's condition never markedly improved and she remained out of work. Plaintiff had repeated difficulty getting medication refilled which exacerbated her condition and increased her depression.
34. Plaintiff presented to Dr. Prakken on June 8, 2005. She remains under his care. On examination, Dr. Prakken found plaintiff was suffering from depression and her prior treatment was neither strong nor consistent enough. Dr. Prakken has been treating plaintiff for her depression, anxiety, suicidal ideation, and her inability to engage in a productive life.
35. Dr. Prakken found that during late Summer and early Autumn of 2005, plaintiff was actually profoundly suicidal because of her inability to receive medication despite numerous requests to defendant-DUMC's adjuster. Dr. Prakken during approximately the same time had another patient commit suicide because the same Duke adjuster had denied that patient medication. After learning that plaintiff had not received medication between September 2, 2005, and October 26, 2005, Dr. Prakken called defendant-DUMC to try to get plaintiff's medication started again because he saw that plaintiff was "deeply suicidal."
36. Plaintiff suffers from chronic post-laminectomy pain syndrome with recurrent herniated disc at C6-7, fibromyalgia, chronic pulmonary symptoms, hypertension, and chronic depression.
37. Pursuant to the November 30, 2001 Award of the Commission, plaintiff's neck condition is compensable. Plaintiff's pulmonary condition was accepted on a NCIC Form 60 filed by defendant-Gambro, Inc., and is also compensable. *Page 14 
38. Dr. Strader was of the opinion that plaintiff's chemical exposure caused or was a substantial contributing factor in the development of her fibromyalgia, and that plaintiff's cervical pain contributed to the development of her fibromyalgia and certainly made plaintiff more likely to develop fibromyalgia. Plaintiff's injuries as a whole caused her fibromalgia.
39. The Full Commission finds that plaintiff's fibromyalgia is a condition secondary to both of her work injuries and is compensable.
40. Dr. Avery was of the opinion that plaintiff's hypertension was aggravated by the stress caused by her work injuries and chronic pain.
41. The Full Commission finds that plaintiff's hypertension was aggravated by both her compensable injuries. Plaintiff's hypertension is compensable.
42. Plaintiff's physicians are of the opinion that her psychiatric condition was substantially caused or aggravated by her work injuries.
43. The Full Commission finds that plaintiff's psychiatric condition was caused, significantly contributed to and/or aggravated by both her work injuries on December 11, 1999 and October 3, 2001. Thus, plaintiff's psychiatric condition is compensable.
44. Plaintiff is at maximum medical improvement.
45. Plaintiff is totally disabled as a result of her compensable cervical pain, pulmonary condition, psychiatric condition, fibromyalgia, and hypertension. Plaintiff's condition prevents her from maintaining regular attendance in any employment and would require frequent, unscheduled breaks. Thus, the medical evidence, when viewed as a whole and in context, confirms plaintiff is totally disabled from all competitive employment as a medical and psychiatric fact. *Page 15 
46. Plaintiff, to her credit, made unsuccessful attempts to return to work on multiple occasions, but has been unable to maintain competitive employment. Plaintiff has performed a reasonable job search, considering her multiple medical and psychiatric conditions.
47. The November 30, 2001 Opinion and Award constitutes a final Award of the Industrial Commission. It found plaintiff totally disabled, awarding temporary partial disability (TPD) benefits as a result of plaintiff's ultimately unsuccessful attempt to return to work at Cary Oncology. Plaintiff's return to work attempts never exceeded nine months.
48. Neither defendant filed a NCIC Form 28T in connection with any return to work attempt by plaintiff. Neither provided any vocational assistance to plaintiff whatsoever. Neither defendant has identified any competitive employment within plaintiff's multiple limitations.
49. Neither defendant-DUMC nor defendant-Gambro, Inc., has paid plaintiff indemnity benefits while she has been out of work since April 4, 2001.
50. There is no question that plaintiff is totally disabled. This disability is substantially due to both plaintiff's December 11, 1999 and October 3, 2001 work injuries and any attempt to apportion disability between the two injuries would be speculative.
51. Plaintiff has sustained a substantial change in her wage earning capacity and in her medical condition since her modified employment at Cary Oncology ended unsuccessfully on April 4, 2001. Plaintiff's sporadic earnings in unsuccessful return to work attempts with defendant-Gambro, Inc., and John Umstead Hospital are not evidence that she retains competitive wage earning capacity.
52. Neither defendant-DUMC nor defendant-Gambro, Inc., has defended this case on legitimate grounds. The medical evidence shows that plaintiff is totally disabled as a medical and psychiatric fact. *Page 16 
53. Defendant-DUMC has failed to pay temporary partial disability benefits awarded in the previous decision of the Industrial Commission. Plaintiff is entitled to a late payment penalty on all back due indemnity benefits due and owing from defendant-DUMC under the prior Award in this case.
54. Plaintiff will require lifetime medical care for her condition including medications, psychiatric care, pain management, inhalers, physical therapy, fibromyalgia treatment, injections, and potential surgery and is entitled to have defendants provide the same.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On December 11, 1999, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant-DUMC resulting in her chronic cervical condition. N.C. Gen. Stat. § 97-2(6).
2. On October 3, 2001, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant-Gambro, Inc., resulting in her chronic pulmonary condition. N.C. Gen. Stat. § 97-2(6).
3. When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct. Horne v. Universal Leaf Tobacco Processors, 119 N.C. App 682,459 S.E.2d 797 (1995). Thus, plaintiff's secondary psychiatric condition, fibromyalgia, and *Page 17 
hypertension are compensable as a result of plaintiff's injuries with both defendant-DUMC and defendant-Gambro, Inc. N.C. Gen. Stat. § 97-25.
4. Once disability is proven, either by execution of a NCIC Form 21 or by award of the Commission, there is a presumption that it continues until the employee returns to work at wages equal to those he was receiving at the time his injury occurred. Watson v. Winston-SalemTransit Authority, 92 N.C. App. 473, 476, 374 S.E.2d 483, 485 (1988). Plaintiff may attempt a trial return to work for a period not to exceed nine months without prejudicing the presumption of disability. N.C. Gen. Stat. § 97-32.1. Since none of plaintiff's return to work attempts exceeded nine months and since defendant-DUMC never filed a NCIC Form 28T, plaintiff has the benefit of the presumption of disability as to defendant-DUMC.
5. Neither defendant has presented evidence of suitable employment within plaintiff's limitations. Thus, plaintiff is entitled to continuing total disability compensation from defendant-DUMC.Peoples v. Cone Mills Corp., 316 N.C. 426, 342 S.E.2d 798 (1986);Saums v. Raleigh Community Hospital, 346 N.C. 760, 487 S.E.2d 746
(1997).
6. As a result of both compensable injuries, plaintiff is unable to earn wages in the same or other employment and has been totally disabled from all employment since December 15, 2001, and continuing. N.C. Gen. Stat. §§ 97-29 and 97-47; Russell v. Lowes Prod. Dist.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). See also Saumsv. Raleigh Community Hospital, 346 N.C. 760, 487 S.E.2d 746 (1997).
7. Any attempt to apportion plaintiff's disability between her injuries with defendant-DUMC and defendant-Gambro, Inc., would be speculative and thus improper. Errante v. Cumberland County Solid WasteMgmt., 106 N.C. App. 114, 119, 415 S.E.2d 583, *Page 18 
586 (1992). Both defendants are jointly and severally liable for plaintiff's disability compensation.
8. Plaintiff is entitled to compensation at the rate of $560.00 per week for periods of disability prior to December 15, 2001, to be paid exclusively by defendant-DUMC. Plaintiff is also entitled to the mandatory 10% late payment penalty on back due, unpaid compensation owed by defendant-DUMC under the prior Award through the date of the Opinion and Award filed by Deputy Commissioner Taylor, subject to a credit for any amounts of TPD actually paid. N.C. Gen. Stat. § 97-18; Allmon v.Alcatel, Inc., 124 N.C. App. 341, 477 S.E.2d 90 (1996).
9. Plaintiff is entitled to compensation for total disability at $613.36 per week for periods following December 15, 2001. Since apportionment of the relative contributions of each defendant to plaintiff's total disability is not feasible and would be speculative, each defendant is responsible for payment of one-half of the compensation due plaintiff from December 15, 2001, through the date of hearing before Deputy Commissioner Taylor and continuing through plaintiff's lifetime or until further order of the Commission. N.C. Gen. Stat. §§ 97-29 and 97-47. Dalton v. Anvil Knitwear, 119 N.C. App. 275,458 S.E.2d 251 (1995); Franklin v. Broyhill Furn. Ind.,123 N.C. App. 200, 472 S.E.2d 382 (1946).
10. Defendants are obligated to provide to plaintiff such medical treatment as is reasonably required as a result of her injuries by accident to effect a cure, give relief, or lessen her disability. N.C. Gen. Stat. § 97-25; Little v. Penn Ventilator Co., 317 N.C. 206,345 S.E.2d 204 (1986). Defendant-DUMC shall be solely responsible for treatment of plaintiff's compensable cervical condition and chronic pain resulting therefrom. Defendant-Gambro, Inc., shall be solely responsible for treatment related to plaintiff's compensable pulmonary condition. Defendant-DUMC and defendant-Gambro, Inc. shall be equally responsible for payment of all *Page 19 
necessary medical and psychiatric treatment related to plaintiff's compensable psychiatric condition, hypertension, and fibromyalgia.
11. Plaintiff is entitled to reimbursement for past expenses incurred as a result of her work-related injuries, for travel, pharmaceutical expenses, hospitalization, and medical treatment, after plaintiff properly submits an itemized statement to defendants. N.C. Gen. Stat. § 97-25.
12. Plaintiff has shown a substantial risk of the need for future medical care for her compensable cervical condition, pulmonary condition, psychiatric condition, hypertension, and fibromyalgia. N.C. Gen. Stat. § 97-25.1. Thus, plaintiff is entitled to lifetime medical care, including medication, psychiatric care, pain management, inhalers, physical therapy, fibromyalgia treatment, injections, and potential surgery. N.C. Gen. Stat. §§ 97-2(19), 97-25, and 97-29. Taylor v.Bridgestone/Firestone, Inc., 157 N.C. App. 453, 579 S.E.2d 413,dissent adopted per curiam, 357 N.C. 565, 598 S.E.2d 379 (2003).
13. Dr. Atasoy and Dr. Prakken are designated treating physicians and shall coordinate plaintiff's future medical and psychiatric care and treatment. N.C. Gen. Stat. § 97-25.
14. Defendants have defended this claim without reasonable grounds. This conduct amounts to stubborn, unfounded litigiousness. Troutman v.White Simpson Inc., 121 N.C. App. 48, 464 S.E.2d 481 (1995), disc.review denied, 343 N.C. 516, 472 S.E.2d 26; N.C. Gen. Stat. § 97-88.1.
15. Defendants are not entitled to a credit for sporadic earnings during plaintiff's commendable, but unsuccessful, return to work attempts after December 15, 2001. N.C. Gen. Stat. § 97-42 *Page 20 
16. Plaintiff's counsel has rendered valuable services and is entitled to a reasonable attorney's fee. N.C. Gen. Stat. § 97-90.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant-DUMC shall pay to plaintiff past due disability compensation for periods of disability prior to December 15, 2001, at the rate of $560.00 per week. Defendant-DUMC and Defendant-Gambro, Inc., are jointly and severally liable for all amounts owing to plaintiff after December 15, 2001, and said amounts shall be split equally between the two carriers. Both defendants shall jointly pay to plaintiff disability compensation in the total amount of $613.36 per week, until further order of the Commission, beginning December 15, 2001. Any unpaid benefits through the date of hearing before Deputy Commissioner Taylor shall be forwarded directly to plaintiff in one lump sum subject to a credit for any benefits already paid.
2. Defendants shall pay all reasonable medical expenses incurred or to be incurred in the future by plaintiff as a result of her compensable cervical condition, pulmonary condition, fibromyalgia, psychiatric condition, and hypertension, and shall timely authorize and pay for such treatment, referrals, medication, and diagnostic studies as may be prescribed by plaintiff's treating physicians, Dr. Atasoy and Dr. Prakken for the remainder of plaintiff's lifetime. Defendant-DUMC shall be solely responsible for medical expenses incurred or to be incurred as a result of plaintiff's compensable cervical condition and chronic pain. Defendant-Gambro, Inc., shall be solely responsible for medical expenses incurred or to be incurred as a result of *Page 21 
plaintiff's compensable pulmonary condition. Defendant-DUMC shall be solely responsible for payment of all reasonable medical expenses incurred or to be incurred as a result of plaintiff's compensable secondary psychiatric condition, fibromyalgia, and hypertension, subject to timely reimbursement for one-half of such expenses by defendant-Gambro, Inc., upon presentation of proper documentation.
3. Defendants shall timely pay the related medical bills from plaintiff's physicians, including Dr. Avery, Dr. Durr, Dr. Masood, Dr. Attix, Dr. Tharwani, Dr. Atasoy, Dr. Prakken, Dr. Rieker, and Dr. Strader that have been denied.
4. Defendant-DUMC shall reimburse plaintiff directly for all out-of-pocket expenses in connection with treatment by plaintiff's physicians, which were not previously authorized, except for treatment of plaintiff's pulmonary condition. Defendant-Gambro, Inc., shall reimburse plaintiff directly for all out-of-pocket expenses in connection with treatment by plaintiff's physicians for her pulmonary condition which have not previously been authorized. Defendant-DUMC shall be entitled to reimbursement from defendant-Gambro, Inc., for all such expenses in the manner provided in Paragraph 2 above.
5. As sanctions for defendants unreasonable denial and defense of this claim, plaintiff's attorney's fee to the date of this Opinion and Award of twenty-five percent (25%) shall be paid directly by defendants, one-half by each, and shall not be deducted from the sums due plaintiff. Accordingly, defendants shall forward to plaintiff's counsel as his fee an amount equal to twenty-five percent (25%) of the total disability benefits due and owing since December 15, 2001, to the date of this Opinion and Award. As to the attorney's fee accrued following the date of this Award, defendants shall deduct from plaintiff and forward an amount equal to every fourth future compensation check directly to plaintiff's counsel, and shall reimburse plaintiff's *Page 22 
counsel for all costs advanced as a result of this litigation upon presentation of an itemized statement. Defendants are jointly and severally liable for this attorney's fee and costs and shall each be responsible for timely payment of one-half of the attorney's fee and costs due.
6. Defendants shall pay costs; including expert witness fees, which are hereby approved, as follows: $630.00 to Dr. Atasoy, $290.00 to Dr. Attix, $810.00 to Dr. Durr and $420.00 to Dr. Rieker.
This the 18th day of April, 2008.
S/__________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/__________ CHRISTOPHER SCOTT COMMISSIONER
 S/_________ PAMELA T. YOUNG CHAIR *Page 1